IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 07CR2016-IEG |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | SAN DIEGO, CA |
| | ) | JANUARY 27, 2010 |
| DOLORES LOVIN, *ET AL.*, | ) | 9:00 A.M. |
| DEFENDANTS. | ) | |


TRANSCRIPT OF ORDER TO SHOW CAUSE HEARING

BEFORE THE HONORABLE IRMA E. GONZALEZ

UNITED STATES DISTRICT CHIEF JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        OFFICE OF THE U. S. ATTORNEY
                          BY:  PHILLIP L. B. HALPERN, ESQ.
                               BRENDA K. MORRIS, ESQ.
                               VALERIE H. CHU, ESQ.

FOR DEFENDANT LOVIN:       SELTZER, CAPLAN, MCMAHON & VITEK
                          BY:  PATRICK Q. HALL, ESQ.

FOR DEFENDANT ARONSON:     LAW OFFICES OF JOHN C. LEMON
                          BY:  JOHN C. LEMON, ESQ.

FOR DEFENDANT KOCH:        FEDERAL DEFENDERS OF SAN DIEGO, INC.
                          BY:  ELLIS M. JOHNSTON, III, ESQ.
                               JOHN C. ELLIS, JR., ESQ.

FOR DEFENDANT BIDWELL:     BRODEN & MICHELSEN
                          BY:  F. CLINTON BRODEN, ESQ.


(APPEARANCES CONTINUED ON NEXT PAGE)

```
(APPEARANCES CONTINUED)

FOR DEFENDANT LIGHT:      BURLESON, PATE & GIBSON
                          BY:  MICHAEL P. GIBSON, ESQ.
                               CARL D. MEDDERS, ESQ.


FOR DEFENDANT TYLER:      LAW OFFICES OF NANCY KENNEDY
                          BY:  NANCY KENNEDY, ESQ.


FOR DEFENDANT BRAGANSA:   BARDSLEY & CARLOS
                          BY:  MARC X. CARLOS, ESQ.


COURT REPORTER:           FRANK J. RANGUS, OCR
                          U. S. COURTHOUSE, RM. 4194
                          940 FRONT STREET
                          SAN DIEGO, CA  92101
                          (619) 531-0171
```

PROCEEDINGS RECORDED BY ELECTRONIC STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER.

I N D E X

ARGUMENTS:                      PAGE

MR. GIBSON                         6

MR. HALPERN                        8

MR. GIBSON                        31

MR. BRODEN                        48

MS. KENNEDY                       51

MR. JOHNSTON                      55

MR. GIBSON                        64

MR. BRODEN                        65

MR. HALPERN                       66

MR. HALL                          72

MR. LEMON                         77

MR. BRODEN                        78

MR. HALPERN                       79

MR. BRODEN                        80

MS. KENNEDY                       81

25

1           THE DEPUTY CLERK:  NUMBER ONE ON CALENDAR, CASE

2   07CR2016, UNITED STATES OF AMERICA VS. DOLORES LOVIN, *ET AL.*,

3   FOR AN ORDER TO SHOW CAUSE HEARING.

4           THE COURT:  YOUR APPEARANCES, PLEASE.

5           MR. HALPERN:  GOOD MORNING, YOUR HONOR.

6           PHIL HALPERN, VALERIE CHU, AND BRENDA MORRIS FOR THE

7   UNITED STATES.

8           THE COURT:  GOOD MORNING.

9           MR. LEMON:  GOOD MORNING, YOUR HONOR.

10          JOHN LEMON FOR MARY ARONSON.  SHE'S WAIVED HER

11  APPEARANCE.

12          MR. HALL:  GOOD MORNING, YOUR HONOR.

13          PATRICK HALL ON BEHALF OF DOLORES LOVIN.  SHE'S

14  PRESENT, SEATED IN THE FIRST ROW.

15          MR. CARLOS:  GOOD MORNING, YOUR HONOR.

16          MARC CARLOS FOR PETER BRAGANSA.  HE'S WAIVED HIS

17  PRESENCE.

18          MR. BRODEN:  GOOD MORNING, YOUR HONOR.

19          CLINT BRODEN ON BEHALF OF PHILIP BIDWELL, WHO'S

20  PRESENT.

21          MR. JOHNSTON:  GOOD MORNING, YOUR HONOR.

22          TRIP JOHNSTON AND JOHN ELLIS ON BEHALF OF MR. KOCH,

23  WHO'S WAIVED HIS PRESENCE.

24          MS. KENNEDY:  GOOD MORNING, YOUR HONOR.

25          NANCY KENNEDY ON BEHALF OF TRACY TYLER, WHO'S SITTING

1    BEHIND ME.

2              MR. GIBSON:  MIKE GIBSON AND CARL MEDDERS PRESENT FOR

3    JEFFREY LIGHT, WHO IS PRESENT IN COURT TODAY.

4              THE COURT:  GOOD MORNING.

5              MR. GIBSON:  GOOD MORNING, YOUR HONOR.

6              THE COURT:  WELL, WE'RE BACK, COVERING SOME OF THE

7    SAME THINGS WE COVERED IN THE PAST, AS FAR AS DISCOVERY IS

8    CONCERNED.

9              I NOTICED MR. WEISS ISN'T HERE TODAY.

10             MR. HALPERN:  HE'S AVAILABLE IF THE COURT WOULD LIKE

11   TO SEE HIM.  I THOUGHT IT WAS ABOUT TIME THAT I TOOK CHARGE OF

12   THIS CASE, YOUR HONOR.

13             THE COURT:  WELL, I SEE THAT YOU AND YOUR CO-COUNSEL

14   DID THE RESPONSES, THE PLEADINGS, SO I ASSUMED THAT YOU WOULD

15   BE HANDLING THE MATTER HERE TODAY.

16             THERE ARE SEVERAL MATTERS THAT WE NEED TO TALK ABOUT

17   THIS MORNING, AND WE'RE GOING TO CONCENTRATE ON THE DISCOVERY,

18   AS OPPOSED TO THE DOCUMENTS THEMSELVES, AUTHENTICATING THEM

19   AND HOW THEY GET INTO EVIDENCE.

20             I'M VERY CONCERNED AND THAT'S WHY I ISSUED THE ORDER

21   TO SHOW CAUSE, BECAUSE, THROUGHOUT THIS WHOLE CASE, THERE HAVE

22   BEEN WHAT I BELIEVE ARE DISCOVERY FAILURES BY THE GOVERNMENT,

23   AND I THINK SOME OF THEM, QUITE A FEW OF THEM ARE DOCUMENTED

24   IN THE PAPERS FROM BOTH SIDES, AND SO IT'S GOTTEN TO THE POINT

25   WHERE I THINK WE HAVE GOT TO THINK ABOUT WHETHER THE -- I DO,

1    AT LEAST -- ABOUT WHETHER THE DISCOVERY FAILURES, AND THE

2    GOVERNMENT CONCEDES QUITE A FEW OF THEM, AMOUNT TO SUBSTANTIAL

3    PREJUDICE AND WHETHER I SHOULD DISMISS THIS CASE BASED ON THE

4    DISCOVERY, WHAT I BELIEVE ARE SOME SERIOUS DISCOVERY, AND I

5    WILL JUST CALL THEM FAILURES, FAILURES TO PRODUCE DOCUMENTS.

6            SO, MR. HALPERN, I DON'T KNOW IF YOU WANT TO START.

7            OR MR. GIBSON.

8            MR. GIBSON:  YOUR HONOR, IF I MIGHT ADDRESS THE

9    COURT.  I'M NOT TRYING TO CUT MR. HALPERN OFF, BUT I DO

10   REQUEST AN OPPORTUNITY, IF THE COURT IS GOING TO TAKE

11   TESTIMONY, I HAVE OUR EXPERT HERE -- I'M SURE THE GOVERNMENT

12   DOES, TOO -- ON THE ISSUES RELATED TO WHETHER OR NOT THOSE

13   SERVERS COULD BE SERVICED TO PRODUCE SOMETHING USABLE, ETC.,

14   AND I THINK THAT TESTIMONY, I'D LIKE TO OFFER IT BEFORE WE GET

15   INTO ARGUMENT, JUST BECAUSE YOU CAN HAVE THE CONTEXT OF IT IN

16   DECIDING THE ISSUE.

17           MR. HALPERN:  YOUR HONOR, I THINK YOU MAY NOT EVEN

18   NEED THE TESTIMONY AFTER YOU HEAR A LITTLE ARGUMENT.  SO I

19   WOULD SAY THAT MAY BE PUTTING THE CART BEFORE THE HORSE, AND I

20   DO THIS ONLY TO TRY TO AVOID WASTING TIME OF THE COURT.

21           THE COURT:  I AGREE.

22           WOULD HIS TESTIMONY BE ANY DIFFERENT THAN WHAT YOU'VE

23   STATED IN YOUR PAPERS?

24           MR. GIBSON:  IT WILL BE A LITTLE DIFFERENT, AND I CAN

25   JUST SUMMARIZE IT QUICKLY.

1           THE COURT:  OKAY.

2           MR. GIBSON:  AS TO THE LAST RESPONSE THAT THEY FILED,

3   ACTUALLY, WHILE WE WERE GETTING READY TO GET ON THE PLANE, AND

4   THAT'S NOT A CRITICISM, WE JUST GOT IT.  THERE ARE TWO THINGS

5   THAT I THINK HE CAN TESTIFY TO THAT I WANT, THAT I THINK WOULD

6   BE IMPORTANT FOR THE COURT, AND THAT IS (1) THE SCOPE OF HIS

7   TASK AND WHAT HE WAS ASKED TO DO OUT HERE WAS ONLY TO IDENTIFY

8   IF THERE WAS ANYTHING ON THESE SERVERS AND WHAT WAS ON THERE

9   AND REPORT BACK TO US SO THAT WE CAN REPORT TO THE COURT, AND

10  THE REASON I RAISED THAT POINT, I WANTED HIM TO CLARIFY THAT

11  BECAUSE THE GOVERNMENT TAKES US TO TASK FOR NOT REASSEMBLING

12  THE RAIDS AND DOING ALL THIS PROCESSING, AND I WILL TELL THE

13  COURT HE WILL TESTIFY, AND IT TOOK MR. SEVEL NUMEROUS MONTHS

14  TO DO THIS.  HE STARTED WORKING IN JULY AND HAD A REPORT IN

15  NOVEMBER.  THAT'S A LONG, DRAWN-OUT PROCESS THAT WOULD BE

16  REQUIRED, AND THAT'S NOT WHAT HE WAS TASKED TO DO.

17          BUT THE MOST IMPORTANT THING IS, WE HAVE A DISPUTE

18  WITH MR. SEVEL'S OPINION, EVEN TODAY, IN HIS DECLARATIONS AND

19  HIS REPORT, THAT NOTHING CAN BE RECOVERED FROM THESE DATABASES

20  THAT ARE IN THE POSSESSION OF THE GOVERNMENT, AND MR.

21  FITZGERALD IS PREPARED TO TESTIFY OTHERWISE, THAT IT IS, AND

22  TO GIVE THE NAMES, AND I HAVE THE NAMES -- I'LL BE GLAD TO

23  GIVE THEM TO COUNSEL -- OF COMMERCIAL COMPANIES THAT THE

24  GOVERNMENT HIRES WHEN THEY TRY TO RECOVER FRAGMENTS AND

25  REMNANTS FROM UNALLOCATED SPACE ON MYSQL AND SQL SERVERS.

1          SO THE ONLY THING HE WOULD OFFER IN CONTRADICTION IS,

2     IN HIS OPINION, THERE IS DATA THAT CAN BE RECOVERED THERE, THE

3     GOVERNMENT CAN DO THAT, THEY SHOULD HAVE DONE IT, AND THEY

4     DIDN'T DO IT.  SO, IF THAT IS SUFFICIENT, THEN WE WILL NOT

5     ADDRESS THAT ISSUE.

6          THE OTHER THING HE WILL ADDRESS, THOUGH, IS THE

7     REPORT AND THE FAILURE TO PRODUCE THAT REPORT AND HOW HE COULD

8     HAVE HELPED US BECAUSE HE'S BEEN RETAINED THROUGHOUT THE

9     PROCESS ON THAT REPORT, BUT I DON'T KNOW IF YOU NEED TESTIMONY

10     ON THAT OR NOT.

11          THE COURT:  RIGHT.  MY TWO BIGGEST CONCERNS, I MEAN,

12     I'M CONCERNED ABOUT MR. WEISS NOT TURNING OVER THE A2

13     INFORMATION, SERVER INFORMATION, BUT I'M CONCERNED ABOUT THE

14     REPORT NOT HAVING BEEN TURNED OVER, AND I'M CONCERNED ABOUT

15     AGENT BRIDGERS' REPORTS AND 302S AND WHATEVER OTHER DOCUMENTS

16     HE GENERATED THAT WERE NEVER TURNED OVER.

17          BUT LET ME HEAR FROM MR. HALPERN.

18          I MEAN, THERE'S NO EXCUSE FOR THE EXPERT'S REPORT NOT

19     BEING TURNED OVER PRIOR TO TRIAL.

20          MR. HALPERN:  I DISAGREE WITH THAT, YOUR HONOR.  I

21     WILL SAY THIS.  I WOULD HAVE DONE SOMETHING DIFFERENTLY.  I

22     HAVE DONE SOMETHING DIFFERENTLY, BUT THAT'S A DIFFERENT

23     QUESTION, AND I'M GOING TO TELL YOU WHY IN A SECOND.  WOULD IT

24     HAVE BEEN PREFERABLE, WOULD IT HAVE BEEN BETTER PRACTICE TO

25     TURN IT OVER?  YES.  I DON'T DISAGREE.  WAS IT REQUIRED UNDER

1    THE RULES?  THAT'S A MORE COMPLICATED AND NUANCED QUESTION,

2    AND, YOUR HONOR, THE LAST THING I WANT TO DO IS GET UP IN

3    FRONT OF YOU AND SPLIT HAIRS ON ANY POINT.  I DON'T THINK,

4    FRANKLY, DISCOVERY IS A PLACE THE GOVERNMENT SHOULD BE

5    SPLITTING HAIRS.

6         THE COURT:  NO, NOT AFTER A MEMORANDUM JUST CAME OUT

7    OF THE DEPARTMENT OF JUSTICE THAT SAYS WHAT YOU'RE SUPPOSED TO

8    DO.  I CAN TELL YOU IT WAS NEVER DONE IN THIS CASE.  THIS WAS

9    DISORGANIZED FROM THE VERY BEGINNING, AND I BLAME THE

10   PROSECUTORS AND THE AGENTS IN THIS CASE, AND THERE'S JUST NO

11   EXCUSE.

12        MR. HALPERN:  WELL, YOUR HONOR, WITHOUT TAKING ISSUE

13   WITH YOUR CONCLUSION, WHETHER THERE'S AN EXCUSE, I MIGHT FEEL

14   (PAUSE) -- NOW, THERE ARE TWO SIDES TO THE STORY, AND PERHAPS

15   ONE THAT THE COURT IS NOT AWARE OF, BUT I'M NOT HERE TO

16   DEFEND, IN PARTICULAR, SOME PRACTICES IN GENERAL.  I'M HERE TO

17   ADDRESS SPECIFIC ALLEGATIONS, AND WHILE THE COURT MIGHT, YOU

18   KNOW, WANT ME TO START FROM THE BEGINNING AND GO TO THE END --

19        THE COURT:  NO, I DON'T WANT YOU TO DO THAT.  WE'D BE

20   HERE FOR DAYS, BELIEVE ME.

21        MR. HALPERN:  OKAY.  WELL, I MEAN, THE IRONY OF ME

22   BEING UP HERE, IN FACT, STRIKES ME PERHAPS, YOU KNOW, I DON'T

23   THINK IT'S LOST ON THE COURT.  THIS IS THE VERY FIRST TIME

24   I'VE BEEN AT THE PODIUM ON THIS CASE, AND I'M ADDRESSING WHAT

25   I CONSIDER A VERY SERIOUS REQUEST BY THE COURT TO SHOW CAUSE

1   WHY IT SHOULD BE MY LAST TIME UP HERE.

2       I WANT YOU TO KNOW AND I THINK THAT THE GOVERNMENT'S

3   PAPERS REVEAL HOW SERIOUS WE TAKE THE COURT'S CONCERNS, AND IT

4   DOESN'T MATTER TO ME ONE BIT THAT NONE OF THE PEOPLE AT THIS

5   PROSECUTION TABLE HAD ANYTHING TO DO WITH WHAT WENT ON BEFORE

6   HERE.  IT MATTERS EVERY BIT AS MUCH TO THE THREE OF US.  IT

7   REFLECTS ON THE GOVERNMENT, WHAT HAPPENED, AND YOU ARE GOING

8   TO GET, AS MUCH AS I AM ABLE TO, AN EXPLANATION FOR WHY THE

9   INDIVIDUAL DECISIONS WERE MADE IN THIS CASE, AND YOU WILL SEE

10  THE REASONS BEHIND THOSE DECISIONS.

11      AND I HAVE TO SAY AT THE OUTSET I WAS VERY DISTURBED

12  BY THE FILING BY MR. GIBSON THAT TRIGGERED THIS EVENT.  I

13  REMAIN VERY DISTURBED BY THE COURT'S OSC.  CLEARLY, THIS IS A

14  CASE WHERE SOMETHING WENT AWRY, AND I THINK THE FAULT, THOUGH,

15  YOUR HONOR, IS NOT ONLY ON THE GOVERNMENT SIDE.  THAT'S ALL

16  I'M SAYING.

17      WE HAVE A DIFFERENT STANDARD.  I RECOGNIZE THAT.

18  I'VE BEEN IN FRONT OF THIS COURT FOR MORE YEARS THAN I CAN

19  RECOUNT.  I'VE NEVER HAD AN ISSUE IN ANY OF THESE AREAS, AND

20  SOMETHING WENT AWRY, AND I'VE SEEN IT IN THE SHORT TIME I'VE

21  BEEN HERE, WHAT HAPPENED, AND I WAS FURIOUS WHEN I WROTE THAT

22  DRAFT, OR MISS CHU AND I WROTE THAT DRAFT TOGETHER, TO BE MORE

23  PRECISE.  I WAS FURIOUS, AND I STEPPED BACK FOR A SECOND, YOU

24  KNOW, BECAUSE I'VE BEEN AROUND A WHILE AND I'M USED TO

25  HANDLING CASES AGAINST THE BIGGEST DEFENSE FIRMS.  I'M USED TO

1   SCORCHED-EARTH LITIGATION, AND I WAS FURIOUS AT THESE PEOPLE

2   FOR SOME OF THEIR REPRESENTATIONS, AND THEN, AFTER A WHILE, I

3   SAID, THEY'RE GOOD.  THEY'RE GOOD.  I MEAN, THERE'S NO

4   QUESTION ABOUT THAT.  SOME OF THE PEOPLE IN MY OFFICE MIGHT

5   WANT TO DISMISS SOME OF THESE COUNSEL AS, OH, WELL, YOU KNOW,

6   THEY'RE NOT FROM WILLIAMS & CONNOLLY, THEY'RE NOT FROM AKIN,

7   GUMP, BUT THEY'RE GOOD.  THEY TOOK FACTS, I BELIEVE, THAT ARE

8   IN THE RECORD AND TWISTED THEM OUT OF ANY SEMBLANCE OF

9   REALITY.  THEY CONFUSED THE COURT.

10          THE COURT:  WELL, YOU HAVEN'T GOTTEN TO THE POINT OF

11   WHY THE REPORT WASN'T TURNED OVER.

12          MR. HALPERN:  WELL, THE REPORT'S EASY, YOUR HONOR.

13   WE HAD AN EXPERT THAT, YOU KNOW, I WANT TO MAKE IT CLEAR.  MR.

14   GIBSON DIDN'T UNDERSTAND THIS, BUT MR. WEISS IS NOT A COMPUTER

15   EXPERT.  MR. WEISS DOESN'T LOOK AT DATA.  SO WHAT HE DID WAS,

16   HE TURNED OVER --

17          THE COURT:  HE ACCEPTED THE RESPONSIBILITY TO PRESENT

18   THIS CASE TO THE GRAND JURY, TO PROSECUTE THE CASE FOR, YOU

19   KNOW, OVER A PERIOD OF TWO YEARS, AND SO HE HAD THAT

20   RESPONSIBILITY OF MAKING SURE THAT THINGS WERE TURNED OVER.

21          MR. HALPERN:  AGREED, BUT THE REPORT THAT HE

22   RECEIVED, AND AGAIN LET'S PUT IT IN CONTEXT, YOUR HONOR.  YOU

23   HAVE TO UNDERSTAND, THIS IS NOT A CASE WHERE THE GOVERNMENT

24   WAS TRYING TO HIDE EVIDENCE FROM THE DEFENSE.  WE WERE THE

25   ONES WHO GOT THE SERVER.  THEY DIDN'T ASK US TO DO IT.  WE

1   WERE THE ONES WHO SPENT THE MONTHS AND MONTHS TO PUT IT, THE

2   DATA, TOGETHER.

3        NOW, AGAIN, IT DIDN'T TAKE FOUR MONTHS, YOU KNOW, AS

4   MR. GIBSON SUGGESTS, ALTHOUGH I CAN UNDERSTAND WHY HE WOULD

5   SAY THAT.  IT TOOK THE TIME TO GET THE EQUIPMENT.  WE NEEDED

6   CERTAIN EQUIPMENT.  THE GOVERNMENT HAD TO ORDER IT.  THE

7   ANALYSIS ITSELF, I IMAGINE, WAS A DAY OR SO.  BUT, REGARDLESS

8   OF THAT, WE WENT TO THE TROUBLE TO DO THAT.  WE WEREN'T DOING

9   THIS TO HIDE ANYTHING.  WE WANTED IT.

10        IT WAS THE GOVERNMENT'S FRUSTRATION, WHEN WE GOT THE

11   EXAMINATION, THAT IT SAID THERE WERE NO DATA FILES IN THERE,

12   IN ANY LOGICAL FILE OR FOLDER.  THERE WERE ONLY REMNANTS AND

13   UNALLOCATED SPACE, AND HERE'S THE KEY.  MR. WEISS HEARD FROM

14   OUR EXPERT, AND IT'S IN HIS DECLARATION, THAT THE FRAGMENTS

15   COULD NOT BE RECONSTRUCTED IN A MEANINGFUL WAY.

16        NOW, ONCE THAT HAPPENS, THAT TRIGGERS A WHOLE

17   DIFFERENT SET OF RULES.  IF THERE'S NOTHING IN HERE, AND

18   THERE'S A DISPUTE ON THIS POINT NOW AND WE'LL GET TO IT, BUT

19   THE COURT HAS TO UNDERSTAND WE HAVE A PROSECUTOR WHO'S DEALING

20   WITH AN EXPERT.  THE EXPERT, WHO WE'LL MAKE PRESENT, IS

21   PERHAPS THE LEADING EXPERT IN SAN DIEGO.  WE USUALLY DON'T USE

22   A COMMERCIAL PERSON IN SAN DIEGO BECAUSE WE HAVE SEVERAL

23   OTHERS, MR. SEVEL IN PARTICULAR, THE FOUNDER OF THE RCFL, ONE

24   OF THE MODELS IN THE COUNTRY IN TERMS OF GETTING DATA.  HIS

25   ENTIRE JOB IS TO RECONSTRUCT DATA.  THIS IS WHAT WE WANT HIM

1    TO DO.  WE WANT HIM TO LOOK AT COMPUTERS AND GET EVIDENCE FOR

2    US.  WE DON'T WANT HIM TO LOOK AT COMPUTERS AND SAY, YOU CAN'T

3    GET ANYTHING.  THAT'S A FAILURE FOR HIM.  THAT'S NOT WHAT WE

4    WANT.

5            SO, AFTER MONTHS, WHEN WE FINALLY WERE ABLE TO GET

6    THE REPORT AND IT SAID THERE WAS NOTHING USEFUL THERE, WE WERE

7    DISAPPOINTED.  THIS WOULD NOT BE SOMETHING NORMALLY WE WOULD

8    WANT OR BE INTERESTED IN HIDING.  BUT MR. WEISS LOOKED AT IT

9    AND HE MADE THE DECISION THEN, WHEN THERE WAS A QUESTION OF A

10   REPORT, AND IT WAS NEVER ASKED HIM DIRECTLY.  IT TOOK A WAYS

11   ON.  I MEAN, IN APRIL, 2008, THERE WAS A MOTION, AND THEN WE

12   HAD THE HEARING IN 2009, WHEN THE ISSUE FINALLY WAS JOINED AND

13   HE WAS PUT TO THE TASK OF TURNING OVER THE SERVER, TURNING

14   OVER THE REPORT.

15           AT THAT TIME, HE TOOK THE POSITION, AS I THINK THE

16   COURT AT THAT TIME WAS INTERESTED IN GETTING THE CASE TO

17   TRIAL, AND HE TOOK THE POSITION, AND I'M NOT SAYING THIS IS

18   RIGHT OR WRONG.  I THINK THERE'S NO QUESTION IN MY MIND HE

19   WOULD DO IT DIFFERENTLY TODAY.  HE DECIDED THAT HE DIDN'T HAVE

20   TO TURN IT OVER AND HE DIDN'T HAVE TO GIVE THEM ACCESS,

21   BECAUSE THERE WAS NOTHING OF VALUE AND HE BELIEVED IT WOULD BE

22   USED SIMPLY TO CAUSE DELAY.  IT WASN'T MATERIAL; THEREFORE, IT

23   DIDN'T HAVE TO BE DISCOVERED.

24           IF IN FACT, YOUR HONOR, THAT CONCLUSION IS CORRECT,

25   THERE IS CLEARLY NO VIOLATION.  IF THAT CONCLUSION IS

1    INCORRECT, THERE IS A DISCOVERY VIOLATION.  THERE'S NO

2    QUESTION ABOUT IT.  IT WOULD -- THERE'S CERTAINLY NO

3    MISCONDUCT.  THERE'S CERTAINLY NO DELIBERATE INTENT, BUT

4    THAT'S THE REASON WHY.

5         SO, BEFORE THE COURT JUMPS TO THE CONCLUSION, WELL,

6    THERE'S A CLEAR VIOLATION, I'D SAY LET'S JUST SIT BACK AND

7    LET'S WAIT BECAUSE, AND I'LL MAKE THIS ADMISSION.  I HAVEN'T

8    LOOKED AT THAT.  I'M NOT GOING TO GET ON THERE WITH SOFTWARE

9    AND ANALYZE IT.  I'M GOING TO GO TO THE BEST PEOPLE WE HAVE,

10   AND I'M GOING TO ASK THEM THREE OR FOUR OR FIVE WAYS, CAN WE

11   PUT THIS THING TOGETHER?

12        AND, YOU KNOW, LET ME MAKE -- THERE'S A LONG STORY

13   AND A SHORT STORY.  I DON'T WANT TO GIVE YOU THE LONG STORY,

14   WHICH HAS TO DO WITH UNALLOCATED SPACE.  I WANT TO TELL YOU IN

15   ONE SIMPLE PHRASE.  WE HAVE BEEN TOLD THIS IS A HUMPTY DUMPTY

16   PROBLEM.  BY THAT, I SIMPLY MEAN ALL THE KING'S HORSES AND ALL

17   THE KING'S MEN ARE NOT GOING TO BE ABLE TO PUT THAT DATA

18   TOGETHER IN A USABLE FORM AGAIN.  END OF STORY.

19        NOW, IF THAT'S INCORRECT, MR. BRODEN, YOU KNOW, I'M

20   AFRAID, OR MR. GIBSON, OR ONE OF HIS COLLEAGUE IS GOING TO

21   SAY, MR. HALPERN COMMITTED MISCONDUCT.  YOU KNOW, LET'S HANG

22   HIM BY THE YARDARM.  YOU KNOW, THE LAST TIME I WAS IN HERE,

23   WHEN I WASN'T TALKING, I WAS A SAINT.  TODAY, I THINK IT MAY

24   BE DIFFERENT, BUT --

25        THE COURT:  WHEN WAS SEVEL'S REPORT COMPLETED?

1        MR. HALPERN:  IT WAS COMPLETED IN NOVEMBER OF 2008.

2    THE HEARING ON IT CAME IN JANUARY, 2009.

3        AND AGAIN, YOU CAN VIEW THIS DIFFERENTLY, YOUR HONOR,

4    BUT, AND IF THERE IS USABLE INFORMATION ON THAT HARD DRIVE,

5    THE COURT, YOU KNOW, THE COURT SHOULD DO WHAT IT'S GOT TO DO.

6    I'M NOT GOING TO GET UP AND TRY TO EXCUSE A DISCOVERY

7    VIOLATION, BUT I DON'T THINK THERE WAS ONE.

8        THE COURT:  YOU'RE STILL STANDING BY YOUR EXPERT'S

9    CONCLUSION THAT --

10        MR. HALPERN:  ABSOLUTELY.

11        THE COURT:  -- IT CANNOT BE PIECED TOGETHER IN USABLE

12    FORM.

13        MR. HALPERN:  YES.

14        I'M NOT EVEN SURE THERE'S A DISAGREEMENT AMONG

15    EXPERTS HERE.

16        THE COURT:  THERE'S NO DISPUTE THERE ARE FRAGMENTS,

17    AND THERE'S NO DISPUTE THAT IT'S IN THIS SPACE, BUT --

18        MR. HALPERN:  RIGHT.

19        THE COURT:  -- THE CONCLUSION, I THINK, IS DIFFERENT.

20        MR. HALPERN:  WELL, NO, NOT NECESSARILY.  IT'S A

21    NUANCED CONCLUSION, AND MAYBE, AGAIN, MR. GIBSON WOULD

22    (PAUSE) --

23        THE COURT:  WELL, HE WANTS TO CHALLENGE THAT

24    CONCLUSION.

25        MR. HALPERN:  RIGHT.  ABSOLUTELY.

1        THE COURT:  LET'S GET BACK TO WHY IT WASN'T.  LET'S

2   ASSUME, I MEAN, THAT IT CAN'T BE USED --

3        MR. HALPERN:  WELL, THEN, THERE'S NO VIOLATION.

4        THE COURT:  -- AND THAT MR. WEISS DIDN'T TURN IT OVER

5   BECAUSE HE BELIEVED THE EXPERT'S CONCLUSION, AND SO,

6   THEREFORE, IT'S YOUR POSITION THAT THERE WAS NO RULE 16

7   VIOLATION.

8        MR. HALPERN:  WELL, THAT'S CLEAR CASE LAW, YOUR

9   HONOR.  I THINK THAT'S UNITED STATES VS. THOMPSON.  IF THE

10   ITEM IS NOT MATERIAL, THERE'S NO REASON TO TURN OVER THE

11   REPORT.  AGAIN, WOULD YOU DO IT DIFFERENTLY IF YOU WERE STILL

12   PROSECUTING?  AS A JUDGE, WOULD YOU LIKE TO SEE IT DONE

13   DIFFERENTLY?  WOULD I DO IT DIFFERENTLY?  PERHAPS SO, BUT IS

14   THERE A DISCOVERY VIOLATION?  NO, THERE IS NOT.

15        AND I HAVE TO SAY THIS.  YOU KNOW, WHEN I TALKED

16   ABOUT WHETHER THERE ARE TWO SIDES TO THIS STORY, I THINK THERE

17   ARE, AND I'M NOT ATTEMPTING TO EXCUSE ANYTHING THAT WENT ON

18   BEFORE THAT YOU WITNESSED, AND I WASN'T HERE.  YOU KNOW, I

19   TAKE THE COURT, I HAVE THE UTMOST RESPECT FOR THE COURT.  YOU

20   KNOW --

21        THE COURT:  DON'T TELL ME STORIES.  LET'S GO ON TO

22   THE --

23        MR. HALPERN:  OKAY.

24        THE COURT:  -- 300-AND-SOMETHING THOUSAND, THE A2

25   SERVER THAT (PAUSE) --

1          MR. HALPERN:  OKAY.  IT'S ONCE AGAIN --

2          THE COURT:  -- THAT APPLEYARD, THAT WAS ON

3     APPLEYARD'S, LET'S SEE, ON THE HARD DRIVE.

4          MR. HALPERN:  APPLEYARD'S A2.

5          THE COURT:  YES, APPLEYARD'S A2, AS OPPOSED TO

6     PRICER'S A2.

7          MR. HALPERN.  RIGHT.

8          THE COURT:  BECAUSE PRICER'S A2 WAS A DISK, OR DISKS,

9     AND THEN APPLEYARD PRODUCED THE HARD DRIVE, COULD NOT OPEN IT,

10    AND ONLY HAD THE A1 ON THERE, BUT THEN IT WAS DISCOVERED AT

11    SOME POINT -- THIS WAS DURING TRIAL.  CORRECT?

12         MR. HALPERN:  NO.

13         THE COURT:  OR RIGHT BEFORE TRIAL.

14         MR. HALPERN:  IT WAS DISCOVERED BY THE PROSECUTION

15    TEAM IN AN E-MAIL THAT WAS SENT TO MR. WEISS, I BELIEVE, ON

16    JANUARY 28TH, I BELIEVE IS MY RECOLLECTION, YOUR HONOR -- IT'S

17    IN THE EXHIBITS -- OF 2009.  SO IT WOULD BE RIGHT ON THE EVE

18    OF TRIAL THAT IT WAS DISCOVERED.

19         AT THAT PERIOD IN TIME, THE GOVERNMENT HAD ITS

20    EXHIBITS PUT TOGETHER.  IT HAD ITS EVIDENCE ASSEMBLED.  THE

21    DISCOVERY WAS OUT, AND WHAT HE RECEIVED AT THAT POINT WAS

22    ADDITIONAL INFORMATION ON THE ORDERS THAT WERE ALREADY TURNED

23    OVER ON THE A2 DATA.  THE FILE, IN SHORT, ALLOWED HIM TO LINK

24    SPECIFIC ORDERS THAT HAD BEEN TURNED OVER TO SPECIFIC

25    DEFENDANTS.  IT WAS THE AFFILIATE INFORMATION.  IT WAS NONE OF

1    THE DOCTOR INFORMATION.

2         I KNOW, YOU KNOW, THERE'S SOME QUESTION, OH, WERE

3    THERE EXAMPLES OF UNFILLED ORDERS?  AND I THINK MS. KENNEDY

4    MADE THAT POINT IN HER BRIEF, THAT THIS WAS A POSSIBLE THEORY.

5    WITHOUT GETTING INTO IT, I'LL SAY THIS.  IT WAS NO DIFFERENT,

6    REALLY.  THE SAME INFORMATION IN TERMS OF FILLED ORDERS AND

7    UNFILLED ORDERS WAS ON THE A1 DATA, YOU KNOW, IN APPLEYARD AND

8    PRICER.  YOU KNOW, THAT WAS TURNED OVER.  SO IT WASN'T THAT

9    THEY DIDN'T HAVE THIS, YOU KNOW, EVIDENCE OF THIS CLAIM THAT,

10   YOU KNOW, IN ADDITION TO LINKING IT, WE COULD SEE THAT THERE

11   WERE UNFILLED ORDERS.  BUT WHAT WAS ON THERE IN TERMS OF WHAT

12   THE GOVERNMENT COULD USE, IT HAD THE ABILITY TO LINK, WHICH

13   THEY HADN'T HAD BEFORE.

14        SHOULD THIS HAVE BEEN TURNED OVER, YOUR HONOR?

15   AGAIN, I TURNED IT OVER.  YOU KNOW, MS. MORRIS AND I, THE

16   MINUTE WE GOT ON THIS CASE, WE LOOKED AT THE THINGS AND WE

17   WANTED TO DO IT, YOU KNOW, EXACTLY THE WAY BUSINESS IS

18   PRACTICED IN THIS JURISDICTION, AND WE TURNED IT OVER.  BUT IT

19   COMES DOWN AGAIN --

20        THE COURT:  HOW MANY DOCUMENTS WERE THERE?

21        MR. HALPERN:  THEY AREN'T DOCUMENTS *PER SE*.  THEY'RE

22   FILES AND LINKS, AND YOU HAVE PARTS OF IT.  IT ENABLES US TO

23   HAVE ACCESS.  YOU PUT IT ON A DATABASE, WHICH GOES BACK TO

24   WHETHER THE THING IS USABLE OR NOT.  IF YOU PUT THIS ON A

25   DATABASE, IT BECOMES SO IMPORTANT, BECAUSE IT CAN LINK WHAT

1    WAS ON THAT DATABASE.

2            THE COURT:  BUT IT'S HUNDREDS OF THOUSANDS OF

3    (PAUSE) --

4            MR. HALPERN:  THERE ARE 289,000 ORDERS THAT WE'RE

5    TALKING ABOUT, AND YOU'RE ABLE TO LINK THE SPECIFIC DEFENDANT

6    TO THAT.

7            NOW, I SEE THE COURT SAYING, WELL, THERE ARE HUNDREDS

8    OF THOUSANDS OF ORDERS.  AGAIN, THIS IS ELECTRONIC DATA, YOUR

9    HONOR, AND I CAN'T SAY THIS, YOU KNOW, ENOUGH TIMES.  I DON'T

10   WANT TO TAKE ISSUE WITH THE COURT.  I DON'T WANT TO ARGUE WITH

11   THE COURT.  I WOULD BE RIGHTLY CONCERNED.  WE TURNED IT OVER.

12           BUT THE EVIDENCE ON THAT A2 DISK, AND I SAID THIS, I

13   THINK, WHEN I STOOD UP THERE THE ONE TIME I SPOKE IN THE CASE,

14   YOU KNOW, TO MAKE SURE MR. WEISS UNDERSTOOD IT, BECAUSE HE WAS

15   GETTING UP TO THE PODIUM AND I THINK HE WAS IN THE PROCESS OF

16   SAYING, WE'RE NOT EVEN GOING TO USE THAT, WE DO NOT WANT TO

17   USE IT, WE DIDN'T USE IT IN THE LAST TRIAL.  AND I SAID, WHOA,

18   NOT SO FAST, YOU KNOW, BECAUSE THE FACT OF THE MATTER WAS, I

19   WANT TO USE IT.  I INTEND TO USE IT.  IT'S GOOD EVIDENCE.  IT

20   DOESN'T HELP THEM AT ALL.  IT HELPS US.  YOU KNOW, IT

21   INCREASES THE ORDERS, I THINK, ON MR. KOCH BY ABOUT 38,000.

22   HE GOT THE BENEFIT OF THE DOUBT, AND IT INCREASES THE ORDERS

23   ON MR. TYLER BY ABOUT 4,000, I THINK, AND THOSE ARE ROUGH

24   ESTIMATES.  I WOULD HAVE TO LOOK.  BUT WHATEVER THE FIGURES

25   ARE, THIS IS INCULPATORY EVIDENCE, IN MY OPINION.

1     AND AGAIN, IF IT IS, AND THE DEFENSE HAS GOT TO TAKE

2    ISSUE WITH THIS, I KNOW, THERE IS NO VIOLATION, AND I WILL

3    STRENUOUSLY ASSERT TO THE COURT THAT I DON'T BELIEVE IT WAS

4    REQUIRED.

5     THIS IS MY REPUTATION ON THE LINE NOW ALSO, YOUR

6    HONOR.  YOU NEED TO HEAR THE ARGUMENTS, AND YOU WILL HAVE THE

7    FACTS AND YOU WILL DECIDE, BUT AS I LOOK AT THAT, AND AS WE

8    WROTE, WE DON'T BELIEVE IT'S BRADY.  I MEAN, THE OTHER SIDE IS

9    GOING TO GET UP AND SAY THEY THINK IT IS BRADY.  I CAN'T BE

10    ANY CLEARER.  I'M NOT GOING TO GET INTO A HE-SAID/SHE-SAID

11    WITH THEM.  IT'S CLEAR IN OUR DOCUMENTS.  THE COURT CAN LOOK

12    AT THEM.  THEY HAVE THEIRS.  THERE'S NOTHING I CAN SAY OTHER

13    THAN TO PILE ON.

14     I THINK ONE OF THE PROBLEMS IN THIS CASE IS THAT BOTH

15    SIDES, AND I SAW IT IN MY TWO BRIEF TIMES SITTING AT COUNSEL

16    TABLE, WHERE BOTH SIDES WENT BACK AND FORTH AND BACK AND

17    FORTH, AND EVERYBODY TOOK ISSUE WITH EVERY FACT.  MR. BRODEN,

18    AGAIN, I'D GET MAD AT HIM IF IT WASN'T SO CLEVER.  I MEAN, WE

19    LOOKED AT THE SAME DOCUMENT.  IT'S IN THE BRIEF.  I LOOKED AT

20    IT.  CLEARLY, IT'S ONE AND ONE IS TWO.  HE MANAGES TO MAKE ONE

21    AND ONE THREE IN HIS ARGUMENT, AND HE'S GOING TO GET UP HERE,

22    OR MR. TYLER, THEY'RE GOING TO GET UP HERE AND THEY'RE GOING

23    TO SAY THE SAME THING.

24     I DON'T AGREE WITH THEM.  IT'S IN WRITING.  I DON'T

25    NEED TO GET BACK UP.  HE'S GOING TO SAY THE PROSECUTOR'S WRONG

1    ON THAT POINT.  FINE, LET HIM DO IT.  YOU KNOW, I'M NOT GOING

2    TO WASTE THE COURT'S TIME.  WE SPENT A LOT OF TIME PUTTING IT

3    IN WRITING.  WE ANSWERED EVERY SINGLE ONE OF HIS CHARGES.  THE

4    BELLIS EVIDENCE SHOWS IT'S MORE UNRELIABLE.  IT DOES NOT.  IT

5    SHOWS IT'S MORE RELIABLE.  HE'S NOT GOING TO ACCEPT THAT.

6    HE'S GOING TO GET UP AND HE'S GOING TO ARGUE FOR WHATEVER HE'S

7    GOT TO DO.

8            BUT I HAVE TO TELL YOU ONE THING.  I'M GOING TO BE IN

9    THIS COURTROOM PROBABLY NEXT MONTH, NEXT YEAR, OR THEREAFTER,

10   UNLESS I GET LUCKY ENOUGH TO RETIRE.  ALL I CAN SAY IS, I PUT

11   IT IN WRITING.  THIS IS OUR POSITION, THE BEST I KNOW.  THAT'S

12   WHAT IT IS, YOUR HONOR.  IF I'M -- YOU KNOW, YOU'LL SEE IT,

13   AND BECAUSE OF THAT IS WHY I DON'T THINK IT'S TECHNICALLY A

14   DISCOVERY VIOLATION.

15           SHOULD THE COURT BE MAD?  YES, YOU SHOULD BE ANGRY,

16   BECAUSE YOU SHOULD SAY, WELL, COME ON, ESPECIALLY IN LIGHT OF

17   THE ATTORNEY GENERAL'S MEMO, YOU COULD HAVE DONE BETTER.  YOU

18   SHOULD HAVE TRIED TO BE BROADER.  BUT AGAIN, AND I KNOW THE

19   COURT DOESN'T WANT TO HEAR THIS, BUT I GET IT NOW.  I'VE

20   RESPONDED TO THESE MOTIONS.  THESE COUNSEL USE EVERY LITTLE

21   THING YOU GIVE THEM AND THEY TWIST IT.  LOOK, YOU KNOW, THE

22   VERY HEARINGS, THE VERY MOTIONS THAT PRECIPITATED THIS, YOUR

23   HONOR, I BELIEVE, WERE LITTERED WITH SIMPLE MISSTATEMENTS, AND

24   THEY WERE MISSTATEMENTS THAT HAD CAUSES THAT WERE VERY

25   SERIOUS.

1          THE COURT:  WELL, I'LL HEAR FROM THE DEFENDANTS, BUT

2    I'M GOING TO MOVE YOU ON.

3          MR. HALPERN:  OKAY.

4          THE COURT:  YOU'LL HAVE A CHANCE TO REBUT.  I WILL

5    LET YOU RESPOND.

6          MR. HALPERN:  YES.

7          MR. BRODEN:  YOUR HONOR, COULD I ASK ONE QUICK

8    QUESTION ABOUT WHEN THE EVIDENCE WAS FOUND?  THE GOVERNMENT'S

9    POSITION IS THAT THIS A2 WAS FOUND IN JANUARY.

10         MR. HALPERN:  NO.

11         MR. BRODEN:  OKAY, THEN MAYBE I MISSPOKE.

12         MR. HALPERN:  NO, NO, NO.  THAT IS WHEN IT WAS FIRST

13   BROUGHT TO MR. WEISS'S ATTENTION.

14         MR. BRODEN:  OKAY.

15         MR. HALPERN:  I SENT YOU AN E-MAIL.  YOU CAN SEE IT.

16   HEY, LOOK WHAT I FOUND, BASICALLY, YOU KNOW.

17         MR. BRODEN:  THE TRIAL STARTED IN APRIL.  THE COURT

18   WILL RECALL, WHEN MR. WEISS WAS HERE THE LAST TIME, HE SAID HE

19   DISCOVERED THIS DURING TRIAL.

20         THE COURT:  THAT'S WHAT I THOUGHT.

21         MR. HALPERN:  ABSOLUTELY, HE DID SAY THAT, AND THAT'S

22   A GOOD POINT, AND I'VE DISCUSSED THAT WITH MR. WEISS, AND MR.

23   WEISS, AND IT'S IN HIS DECLARATION, YOUR HONOR, HE DIDN'T EVEN

24   REALIZE IT UNTIL WE SHOWED HIM THE E-MAIL.  HE SAID, OH, YEAH,

25   YOU KNOW, NOW I REMEMBER.  BUT WHEN HE WAS HERE, HE LITERALLY,

1    YOU KNOW, AND I UNDERSTAND THAT, BUT HE WAS ABSOLUTELY

2    MISTAKEN BECAUSE, OBVIOUSLY, HE WASN'T GOING TO COME TO THE

3    COURT IF, YOU KNOW, IT'S ALMOST IMMATERIAL THAT HE FOUND IT

4    RIGHT BEFORE TRIAL.

5             THE COURT:  THE E-MAIL WAS SENT WHEN, THEN?

6             MR. HALPERN:  I THINK IT WAS JANUARY 29TH.

7             MR. BRODEN:  I HAVE THE 22ND.

8             MR. HALPERN:  THE 22ND?  YES.  IT'S ATTACHED AS ONE

9    OF THE EXHIBITS.

10            MR. BRODEN:  IT'S THE 22ND.

11            MR. HALPERN:  EXHIBIT A.

12            THE COURT:  SO THAT'S WHEN HE LEARNED ABOUT IT.

13            WHEN DID THE TRIAL START?  I CAN'T EVEN REMEMBER.

14            MR. GIBSON:  APRIL 4TH.

15            THE COURT:  APRIL 4TH.

16            MR. GIBSON:  APRIL 4TH, YES, MA'AM.

17            MR. HALPERN:  IT'S THE 27TH, YOUR HONOR, AND I --

18    EXCUSE ME -- THE 22ND, AND THEN THERE'S A LATER RESPONSE BY

19    MR. WEISS ON THE 31ST IS WHEN.

20            SO THAT, AS FAR AS I CAN SEE, AND I DID, WE ALL DID A

21    LOT OF WORK TRYING TO ESTABLISH WHAT THE TRUE FACTS WERE, AND,

22    YOU KNOW, THIS IS IMPORTANT TO US BECAUSE THERE'S A BIG

23    DIFFERENCE, AS THE COURT KNOWS, AND I APPRECIATE THE COURT'S

24    USE OF THE TERM FAILURE AND THE CARE YOU'RE SHOWING, BECAUSE I

25    THINK YOU DO RECOGNIZE THIS IS VERY SERIOUS IN TERMS OF WHAT

1      IT MEANS, NOT ONLY FOR THE PROSECUTION, BUT FOR MR. WEISS.

2              THE COURT:  WHAT ABOUT THE BRIDGERS REPORTS, WHAT

3      THEY ARE?

4              MR. HALPERN:  OKAY.  WELL, THERE ARE TWO WHAT I

5      CONSIDER VIOLATIONS.  I MEAN, I THINK THERE'S A VIOLATION, A

6      DISCOVERY FAILURE, IF YOU'LL HAVE, FOR NOT TURNING OVER THE

7      BRIDGERS REPORT.  THE OTHER JENCKS MATTER IS THE FISHER

8      E-MAIL.

9              THE COURT:  SO HE GENERATED A REPORT WHICH CONSISTED

10     OF OVER A HUNDRED PAGES OR SO.

11             MR. HALPERN:  OKAY.  THAT'S AN AFFIDAVIT.  TO THE

12     EXTENT IT IS JENCKS, YOUR HONOR, I BELIEVE IT'S MAYBE ONE PAGE

13     OF JENCKS.  THE REST I DON'T BELIEVE IS NECESSARILY JENCKS.  I

14     THINK MR. BRODEN WILL LOOK AT IT.  HE MAY SAY, WELL, SOME OF

15     IT COULD BE USED, AND MAYBE IT CAN, AND WE CAN DISAGREE,

16     BUT --

17             THE COURT:  IT WAS AN AFFIDAVIT IN SUPPORT OF

18     (PAUSE) --

19             MR. HALPERN:  OF A SEARCH WARRANT IN ANOTHER CASE.

20             THE COURT:  OF A SEARCH WARRANT.

21             MR. HALPERN:  AND YOU HAVE TO UNDERSTAND, WHEN THE

22     CASE COMES, AND IT'S CLEARLY UNDERSTANDABLE FOR ME,

23     ESPECIALLY, YOU KNOW, BEING IN THE PROSECUTOR'S OFFICE FOR

24     SUCH A LONG TIME, BUT WHEN YOU SIT DOWN WITH A WITNESS, YOU

25     HAVE MANY WITNESSES.  ONE OF THE THINGS THAT A PROSECUTOR DOES

1    IS, CAN I HAVE ALL YOUR REPORTS?  AND, YOU KNOW, DO I HAVE

2    THEM ALL?  AND THEY KNOW OF SEARCH-WARRANT AFFIDAVITS, AND

3    THAT'S STANDARD.

4            IN THIS INSTANCE, THESE SEARCH WARRANTS HAD TO DO

5    WITH OTHER CASES THAT THE WITNESS BELIEVED WERE UNRELATED AT

6    THAT TIME, AND, YOU KNOW, THEY WEREN'T TURNED OVER, OR THEY

7    WEREN'T PRODUCED.  AND COULD THEY HAVE BEEN FOUND WITH A LOT

8    OF DILIGENCE?  WELL, YEAH, I GUESS SO, BECAUSE WE FOUND THEM.

9    I SPENT A LOT OF TIME AND I SPOKE TO AGENT BRIDGERS BECAUSE OF

10   THE FACT THAT I KNEW, I KNEW WE WERE ON A NO-FAILURE SITUATION

11   HERE.  THE COURT WASN'T GOING TO TOLERATE ONE MORE FAILURE,

12   AND I TOLD THAT TO ALL THE AGENTS MANY, MANY TIMES.  WE DON'T

13   HAVE ANY ROOM FOR ERROR IN THIS CASE.

14           AND WHEN I SPOKE, I PERSONALLY SPOKE TO AGENT

15   BRIDGERS, AND I SPENT QUITE SOME TIME WITH HIM, AND I ASKED

16   HIM ABOUT ALL OTHER CASES, ANYTHING HE COULD POSSIBLY HAVE,

17   AND HE SAID, YEAH, I HAVE A COUPLE, BUT ONE OF THEM IS UNDER

18   SEAL.  I SAID, I DON'T CARE IF IT'S UNDER SEAL.  YOU KNOW,

19   WE'VE GOT TO GET IT AND WE'VE GOT TO PRODUCE IT IF IT'S

20   RELEVANT.

21           SOME OF THE ONES I'VE GIVEN COUNSEL, I BELIEVE, FALL

22   OUTSIDE THE JENCKS ACT, AND THEY HAVE NOTHING TO DO WITH HIS

23   TESTIMONY.  IF --

24           THE COURT:  WERE THEY 302S OR JUST (PAUSE) --

25           MR. HALPERN:  THEY WERE SEVERAL AFFIDAVITS AND I

1   THINK THREE 302S, OR SEVERAL 302S, NONE OF WHICH, THOUGH, YOUR

2   HONOR, THEY WEREN'T RELATED TO THIS CASE.  IF THEY WERE

3   RELATED TO THIS CASE, IT WOULD BE AN INEXCUSABLE FAILURE AND I

4   WOULDN'T BE UP HERE TRYING TO, YOU KNOW, SAY YOU SHOULD

5   UNDERSTAND THAT, OR BE FORGIVING OF THAT, BUT THEY WERE IN

6   OTHER CASES AND THIS HAPPENS.

7         NOW, I SAW IN HIS TESTIMONY SOME OF THESE OTHER CASES

8   WERE MENTIONED, AND WHEN I SAW THAT, I SAID, HEY, YOU KNOW,

9   THAT'S WHAT TRIGGERED ME, AND I READ HIS TESTIMONY.  I SAID,

10  WELL, WHAT ABOUT THIS CASE?  DO YOU HAVE ANY REPORTS HERE?  HE

11  SAID, YEAH, I MIGHT HAVE A COUPLE OF SEARCH WARRANTS, AND WE

12  GOT THEM, YOU KNOW, AND I WILL SAY ALSO --

13        THE COURT:  SO, ARE YOU SAYING THERE WAS A JENCKS

14  VIOLATION?

15        MR. HALPERN:  ABSOLUTELY.  YES, THERE WAS ABSOLUTELY

16  A JENCKS VIOLATION THAT I COULD FIND.  WHEN I LOOKED, SPENT

17  WEEKS AND WEEKS LOOKING AT THIS, IN THE HUNDREDS OF THOUSANDS

18  OF DOCUMENTS, I FOUND TWO AREAS, I BELIEVE.  ONE I COULDN'T

19  FIND EXCEPT FOR MR. BRODEN.  MR. BRODEN, TO GIVE HIM CREDIT,

20  AND IT IS, I FEEL SOMETIMES LIKE, AND I SAY THIS IN A

21  COMPLIMENTARY WAY, IT'S LIKE A PACK OF WILD DOGS, THE TRIO

22  FROM TEXAS, BUT HE KEPT ON ME.  HE SAID, LOOK, I KNOW IT'S

23  THERE.  THE WITNESS SAID IT'S THERE.  I LOOKED.  I SENT

24  E-MAILS OUT.  I HAD EVERYBODY LOOK FOR THAT FISHER E-MAIL,

25  AND, FRANKLY, IT'S NOT IN THE GOVERNMENT'S DISCOVERY.

1          NOW, I PROVIDED IT TO HIM ONLY BECAUSE WHEN I

2     COULDN'T FIND IT, I SAID, LOOK, MR. BRODEN SAYS THIS.  I'M

3     TAKING HIM AT HIS WORD.  SO I WENT TO THE WITNESS AND I HAD

4     ONE OF THE AGENTS SAY, DO YOU HAVE ANY E-MAILS THAT YOU EVER

5     SENT TO THE GOVERNMENT?  AND AS LUCK WOULD HAVE IT, THEY WERE

6     ARCHIVED AND HE HAD THE E-MAILS AND I PRODUCED IT, BUT I NEVER

7     FOUND IT IN THE GOVERNMENT'S DISCOVERY.

8          NOW, THAT'S NOT TO SAY IT WASN'T SENT HERE, BECAUSE

9     IT WAS, AND I PUT IT IN THE PAPER.  THE E-MAIL WAS SENT TO AN

10    AGENT WHO LEFT THE AGENCY.  I ASKED HIM, WELL, DID YOU FORWARD

11    IT?  YOU KNOW, HE'S NOT SURE HE FORWARDED IT.  I SAID, CHECK

12    YOUR E-MAILS.  I DON'T HAVE THEM.  I SAID, GO GET THEM.

13    THEY'VE BEEN ARCHIVED, AND HE'S STILL TRYING TO THIS DAY.  I

14    WANT TO KNOW THE ANSWER.  BUT, FOR WHATEVER REASON, THAT

15    E-MAIL IS NOT JUST IN THE POOL OF DISCOVERY.

16         SO, CAN I FAULT MR. WEISS?  WELL, IN THE HEAT OF

17    BATTLE, MAYBE HE COULD HAVE DONE WHAT I DO.  MAYBE HE COULD

18    HAVE FOUND IT.  MR. BRODEN COULD HAVE ASKED THE WITNESS.

19    THERE WAS CLEARLY NO HARM.  BUT, YOU KNOW, AGAIN, PUTTING IT

20    IN --

21         THE COURT:  SO THAT COULD HAVE BEEN USED AT THE TIME

22    THAT FISHER TESTIFIED.

23         MR. HALPERN:  WELL, I SEE WHERE THE -- AGAIN, I DON'T

24    WANT TO QUARREL, BUT I SEE WHERE THE COURT'S GOING, AND I HAVE

25    TO TELL YOU.  I BELIEVE, AND I SAID IT IN THE MOVING PAPERS,

1    THAT THERE WAS NO PREJUDICE.  YOU HAVE TO READ HIS CROSS, AND

2    PERHAPS IT WAS LUCKY.  MAYBE MR. BRODEN AND CO-COUNSEL DID THE

3    GOVERNMENT A FAVOR.  MAYBE THEY SHOULDN'T HAVE BEEN SO GOOD,

4    BUT THEY WERE DILIGENT.  THEY WENT ON THE INTERNET.  THEY

5    FOUND THE SCREEN NAME.

6            YOU READ THE CROSS OF DAVID FISHER, YOU KNOW, AND THE

7    OTHER LITTLE BIT IS ABOUT DAVID GLASS.  YOU READ THE CROSS OF

8    THOSE PEOPLE.  I DON'T THINK ANY COURT ANYWHERE WOULD SAY THAT

9    HAVING THE ADDITIONAL MISSING INFORMATION WOULD HAVE MADE ANY

10   DIFFERENCE.  THEY WERE VERY EFFECTIVE.  THE EXACT POINTS THAT

11   THEY COULD HAVE GOT, THEY GOT TO.

12           AND, YOU KNOW, IN THE CASE OF MR. GLASS, AS I THINK I

13   MIGHT HAVE SAID, I THINK HE WALKED OUT OF THE COURTROOM IN A

14   PUDDLE.  THE FACT THAT IF THEY HAD THE AFFIDAVIT, BRIDGERS'

15   AFFIDAVIT, THEY WOULD HAVE SEEN A LESS-THAN-ONE-PAGE

16   DESCRIPTION OF AN INTERVIEW WITH MR. GLASS WHERE MR. GLASS

17   SAYS, YEAH, ALL THE AFFILIATES INVOLVED KNEW WHAT THEY WERE

18   DOING WAS WRONG.  AS I SAID, I BELIEVE IT'S A PRIOR CONSISTENT

19   STATEMENT.  I MAY TRY TO INTRODUCE IT AT TRIAL.  I KNOW MR.

20   BRODEN.  EVEN MR. BRODEN, I SAY, CAN'T TWIST THAT AND MAKE

21   THAT INTO SOMETHING HE COULD USE.

22           I'LL TELL YOU THIS, THOUGH.  THERE WAS SOME OTHER

23   AREA.  HE MADE HIS ARGUMENT, YOU KNOW, OF WHY, HOW, HE COULD

24   SOMEHOW TWIST IT.  IT WASN'T INCONSISTENT WITH WHAT AGENT

25   BRIDGERS SAID AT TRIAL, BUT WE'RE TALKING IN THIS AFFIDAVIT,

1    AT LEAST CITED BY MR. BRODEN IN HIS BRIEFS.  NOW, IF THERE'S

2    MORE, I'LL TALK ABOUT IT.  BUT IN HIS BRIEFS, WHEN HE TALKED

3    ABOUT THE VIOLATION, WE'RE TALKING ABOUT A PAGE-AND-A-QUARTER.

4    SO I KNOW IT SOUNDS LIKE A LOT, 172 PAGES.  I'VE READ THE

5    CHAPMAN DECISION.  I KNOW WHAT THE STANDARDS ARE.  I ALSO KNOW

6    THIS IS A FAR CRY FROM RECKLESSNESS, BUT I THINK IT'S A

7    PAGE-AND-A-HALF.  AND IF HE SAYS, MR. HALPERN, YOU'RE WRONG,

8    IT'S MORE THAN A PAGE-AND-A-HALF, LET HIM GET UP AND PUT IT IN

9    THE RECORD.

10           THE COURT:  I WANT YOU TO CONCLUDE FOR NOW, AND THEN

11   WE'LL HEAR FROM WHOEVER WANTS TO TALK.

12           MR. HALPERN:  YOUR HONOR, TO THE EXTENT THERE WERE

13   VIOLATIONS, I BELIEVE YOU'LL HAVE THEM ONLY IN THESE MINOR, A

14   COUPLE, YOU KNOW, ITEMS OF JENCKS.  CLEARLY, IT DOESN'T EVEN

15   COME IN THE SAME UNIVERSE OF WHERE YOU WOULD EVER WARRANT

16   DISMISSAL OF A CASE.  THE OTHER VIOLATIONS ARE IN A FAR

17   DIFFERENT ARENA.

18           AND LET ME SAY RIGHT NOW, BEFORE THE COURT DOES

19   ANYTHING, IF MR. GIBSON, AND I KNOW MR. GIBSON'S NOT GOING TO

20   CONTRADICT ME ON THIS, IF HE HAD CALLED ME UP, WELL, (A) HE

21   GETS THE REPORT, BUT (B) HE GETS ME TO SAY TO HIM, AND I'VE

22   SAID IT IN THE PAST, I SAID, MIKE, DO YOU THINK YOU NEED A

23   LITTLE MORE TIME?  I'LL GIVE IT TO YOU.  I'VE GOT NO PROBLEM.

24   I SAID, THERE'S ONLY ONE ISSUE WITH ME GIVING YOU MORE TIME,

25   AND I SAID, I DON'T GIVE THE TIME.  I SAID, IF THE JUDGE IS

1    WILLING TO GIVE YOU MORE TIME, I'M NOT GOING TO GET UP AND SAY

2    HE DOESN'T DESERVE IT.  I'M NOT GOING TO DO THAT TODAY.

3         IF HE SAYS THERE'S SOMETHING USEFUL ON THE DATA, YOU

4    KNOW, AGAIN, I DON'T THINK HE'S GOING TO GET ANYTHING USEFUL.

5    WILL HE GET WHAT HE PRODUCED? WILL HE GET NUMBERS?  I MEAN,

6    YOU SAW MY PAPERS, YOUR HONOR.  YOU CAN LOOK AT THAT DATA JUST

7    LIKE YOU COULD LOOK IT UP IF YOU TOOK ALL YOUR FEDERAL

8    REPORTERS AND YOU RIPPED THEM UP, YOU SHREDDED THEM, YOU THREW

9    THEM UP TO THE TOP OF THIS COURTROOM, YOU MIXED THEM UP SO

10   NOBODY, YOU KNOW, SAW WHERE ANYTHING WENT, YOU COULDN'T PICK

11   UP ONE OF THEM AND SAY, AH-HAH, THIS SAYS UNITED STATES

12   VERSUS.  IT MUST BE THE CASE.

13         THAT'S ALL YOU'RE GOING TO GET, BECAUSE THAT'S ALL

14   THAT'S LEFT, IN MY OPINION.  THAT'S WHY -- THERE'S DATA ON IT.

15   WE NEVER CONTESTED THERE WASN'T.  OUR EXPERTS DID.  IT'S

16   FRAGMENTS.  IT'S NUMBERS.  YOU CAN LOOK AT THOSE NUMBERS AND

17   THE ONLY THING YOU WILL FIND IS, IT PERFECTLY CORROBORATES THE

18   APPLEYARD/PRICER DATA.  THAT'S THE ONLY THING IT'S GOOD FOR,

19   PROBABLY, IS PROVING AGAIN HOW THE APPLEYARD/PRICER DATA IS

20   RELIABLE, ACCURATE, AND THE COURT CLEARLY MADE THE RIGHT

21   RULING ON THAT.

22         SO, IF HE WANTS MORE TIME, AND AGAIN, GIVE HIM HIS

23   TIME.  LET'S COME BACK HERE.  IF HE WANTS THREE OR FOUR

24   MONTHS, LET HIM HAVE IT.  AND IF HE COMES UP AND SAYS, YEAH, I

25   PUT TOGETHER USABLE DATABASE INFORMATION, MY EXPERT CAN USE

1    IT, THEN WE CAN TALK ABOUT IT, YOUR HONOR.  BUT UNTIL THEN,

2    I'M NOT GOING TO CONCEDE A VIOLATION BECAUSE OF OUR EXPERTS,

3    AND I COULD HAVE THEM, BUT THE DECLARATIONS ARE CLEAR.

4           YOU KNOW, WHAT DOES IT MEAN, WHAT I SAY?  I'VE GOT

5    THE LEADING GUY IN SAN DIEGO.  HE SAYS IT CAN'T BE PUT BACK

6    INTO A SQL DATABASE.  IF HE WANTS TO PAY FOR A COMMERCIAL

7    COMPANY TO TRY, SO BE IT.  YOU KNOW, THAT'S THE BEST WE COULD

8    DO.  AND UNLESS THAT HAPPENS, THERE'S NO VIOLATIONS, EXCEPT,

9    YOU KNOW, A COUPLE DOCUMENTS THAT CLEARLY WERE NO, YOU KNOW,

10   NO HARM, NO FOUL.  IT WASN'T RIGHT.  WE TURNED THEM OVER, BUT

11   I CAN SEE HOW IT COULD HAPPEN.

12           THE COURT:  THANK YOU.

13           MR. HALPERN:  THANK YOU, YOUR HONOR.

14           THE COURT:  MR. GIBSON, WE'LL START WITH YOU.

15           MR. GIBSON:  GOOD MORNING, YOUR HONOR.

16           THANK YOU VERY MUCH.

17           THE COURT:  GOOD MORNING.

18           MR. GIBSON:  LET ME START OUT BY A COUPLE OF JUST

19   BRIEF COMMENTS.

20           MR. HALPERN IS VERY ELOQUENT AND VERY GOOD IN HIS

21   ARGUMENT.  WE WERE NEVER HERE ABOUT A CONTINUANCE.  WE ARE NOT

22   HERE TODAY SEEKING A CONTINUANCE.  WE ARE HERE BECAUSE OF THE

23   GOVERNMENT'S CONDUCT PRIOR TO TRIAL, UP TO AND INCLUDING NEAR

24   THE END OF THE TRIAL, WHEN THEY WERE CONTINUALLY ADDING,

25   CHANGING THINGS ON THEIR OWN EXHIBITS, WITH THE JURY IN THE

1    BOX.  IT IS THE GOVERNMENT'S CONDUCT THAT PUTS US HERE, AND

2    THAT'S WHAT I ASK THE COURT TO REMEMBER.

3         THE SECOND THING IS, MR. HALPERN IS A VERY STRONG

4    ADVOCATE FOR THE GOVERNMENT AND FOR HIS DEPARTMENT, AND I

5    RESPECT THAT, BUT THE COURT WILL NOTE THAT MR. HALPERN WAS NOT

6    IN THIS TRIAL, AND THE COURT, WHO'S GOT TO MAKE A VERY

7    DIFFICULT DECISION, WAS IN THE TRIAL, AND THE COURT WILL

8    RECALL, AND I'M GOING TO TRY TO ADDRESS THE CONTEXT IN WHICH

9    MY RESPONSE AND MOTION CAME, THE CONTEXT OF WHERE THE

10   GOVERNMENT, AT EVERY STAGE PRIOR TO TRIAL, DURING TRIAL, AND

11   UP TO THE END, HAD CONTINUING DISCOVERY DISPUTES THAT HAD TO

12   BE ARBITRATED BY THE COURT, AND IT IS THOSE DECISIONS AND THE

13   PATTERN OF CONDUCT, I BELIEVE, THAT RAISES TO THE LEVEL THAT

14   CAUSES THE GRAVE CONCERN THAT THE COURT SHOULD HAVE ABOUT THE

15   DISCOVERY PROCESS AND THE THREE THINGS THAT THE COURT ITEMIZED

16   IN HER ORDER.  BUT IT IS THAT PATTERN THAT I WANT TO TALK

17   ABOUT AND ADDRESS, BECAUSE THEY ARE DISCOVERY FAILURES, BUT

18   THEY ARE EITHER FLAGRANT FAILURES, OR THEY ARE SO RECKLESS FOR

19   THE DISREGARD OF THE PROCESS AND THE INTEGRITY, THE COURT

20   NEEDS TO IMPOSE SANCTIONS ON THE GOVERNMENT, AND, OF COURSE,

21   WE THINK THE APPROPRIATE SANCTION WOULD BE THE DISMISSAL.

22        THE COURT:  AND LET ME JUST MAKE SURE THAT, UNDER THE

23   LAW, THERE HAS TO BE SOME PREJUDICE.  I ASSUME YOU AGREE WITH

24   THAT, THERE HAS TO BE SOME PREJUDICE.

25        MR. GIBSON:  YES, MA'AM.

1          THE COURT:  THAT THEY EITHER, THAT THE VIOLATIONS BY

2    THE GOVERNMENT HAVE TO RISE TO EITHER FLAGRANT VIOLATIONS OR,

3    AS YOU SAID, RECKLESS, RECKLESS VIOLATIONS.  CORRECT?

4          MR. GIBSON:  YES, MA'AM.

5          THE COURT:  OKAY.

6          MR. GIBSON:  WELL, THEN, ALONG THAT CONTEXT, LET US

7    TALK ABOUT THE (PAUSE) -- IT'S HARD TO SEPARATE THE EXPERT'S

8    REPORT FROM THE AFFPOWER SERVERS, OR THE CYPRUS SERVERS, SO

9    I'D LIKE TO KIND OF DO THEM IN PARALLEL, BECAUSE I THINK

10   THAT'S THE MOST EGREGIOUS AND CRITICAL ERROR THAT THE

11   GOVERNMENT INVOLVED ITSELF IN.

12         THE COURT:  THAT'S FINE.

13         MR. GIBSON:  BUT BEFORE I START, THE COURT WILL

14   REMEMBER, THROUGHOUT THE TRIAL, MR. WEISS TOOK THE POSITION

15   ABOUT RULE 16 INTERPRETATION.  THAT IS, IF HE DETERMINED IT

16   WAS NOT USEFUL OR MATERIAL TO THE DEFENSE, WHICH IS IN THE

17   RULE, THEN HE WOULD CHOOSE NOT TO DISCLOSE IT TO THE COURT.

18   THAT INCLUDED, IF THE COURT WILL RECALL, REMEMBER, THERE WAS A

19   DIALOGUE WHEN, I THINK, MR. LIGHT WAS GETTING READY TO

20   TESTIFY.  THERE WAS A DISCUSSION ABOUT WHETHER HE HAD TURNED

21   OVER SOME MATERIAL THAT HE WAS GOING TO USE FOR IMPEACHMENT,

22   AND I BELIEVE HE TOLD THE COURT, I HAVE MATERIAL THAT I'VE NOT

23   GIVEN THE DEFENSE, BUT IT'S MY PREROGATIVE TO DO THAT, AND WE

24   HAD A DISCUSSION AND THE COURT WENT ON.

25         THE POINT IS, HIS MINDSET AND HIS FRAME OF WORK IS, I

1    AM GOING TO DECIDE.  I'M NOT GOING TO INVOLVE THE COURT.  I'M

2    NOT GOING TO INVOLVE THE DEFENDANTS.  I'M GOING TO DECIDE WHAT

3    IS MATERIAL AND WHAT IS USEFUL TO THE DEFENSE.  AND IN THIS

4    CASE, IT WAS A FATAL MISTAKE WHEN HE DID NOT DISCLOSE IN

5    OPENNESS THE SERVERS AND THE REPORT.

6              AND AGAIN, THE CONTEXT OF IT.  THEY TALK ABOUT THE

7    SERVERS BEING RECEIVED, AND I DON'T NEED TO GO THROUGH THE

8    TIME LINE, BUT WHAT'S INTERESTING ABOUT THE SERVERS, WHEN THEY

9    WERE RECEIVED, THE GOVERNMENT, AND MR. HALPERN, AGAIN, NOT

10   BEING A PARTICIPANT, IN HIS PLEADINGS IS NOT MISSTATING

11   ANYTHING, THEY TOLD US ABOUT THEM.  WELL, THEY DIDN'T TELL US

12   ABOUT THEM, YOUR HONOR.

13             IF THE COURT WILL RECALL, IN THE SUMMER OF 2008, WE

14   BEGAN TO GET A HUGE AMOUNT OF DISCOVERY, 80 DISKS, THE

15   THOUSANDS AND THOUSANDS OF DOCUMENTS.  WE NEVER GOT A LETTER,

16   A PHONE CALL, AN E-MAIL THAT SAID, HEY, BY THE WAY, WE NOW

17   HAVE AFFPOWER SERVERS IN OUR POSSESSION.  IT WAS ONLY AFTER

18   SLUGGING THROUGH THAT DISCOVERY THAT -- I'M NOT SURE.  I THINK

19   ONE OF MY CO-COUNSEL MAY HAVE ALERTED THIS TO US, BUT THE

20   DEFENDANTS WERE ALERTED TO THE TRANSPORTATION PAPERS, FED-EX

21   PAPERS, AND THE GOVERNMENT PAPERS, WHERE THE GOVERNMENT

22   RECEIVED THE SERVERS FROM CYPRUS THAT TRIGGERED OUR INQUIRY OF

23   MR. WEISS.  WHAT ARE THESE, AND WHERE ARE THEY, AND HOW DO YOU

24   HAVE THEM?  AND THAT OCCURRED IN LATE FALL OF '08.

25             ONCE WE MADE THE INQUIRY, HE BEGAN TO TAKE THE

1    POSITION, AND I BELIEVE IT'S A PATTERN OF CONDUCT, FOR

2    WHATEVER REASON, AND I DON'T SPEAK FOR HIM, THAT I'M NOT GOING

3    TO DEAL WITH OR DISCLOSE THESE ISSUES.  SO I DON'T WANT TO SAY

4    I MADE, I MADE OR ANYBODY ELSE MADE A SPECIFIC REQUEST BEFORE

5    WE WROTE IN OUR PAPERS, HEY, WE WANT TO LOOK AT THIS STUFF,

6    BUT I THINK THE COURT WILL NOTE ELECTRONIC EVIDENCE AND ACCESS

7    TO IT WAS A CONSTANT ISSUE THAT WE WERE INVOLVED WITH PRIOR TO

8    TRIAL, AND IN THAT REGARD I'M COMFORTABLE THAT SOMEBODY ASKED

9    HIM ABOUT SEEING THOSE THINGS.  BUT HIS POSITION WAS THAT I'M

10   NOT REQUIRED TO GIVE YOU ACCESS TO THEM, AND HE CONTINUED TO

11   DO THAT ALL THROUGH THE TRIAL.

12         THE FIRST THING THAT IS IMPORTANT, THOUGH, IS, IN

13   MARCH OF '08, WE HAD FILED OUR RULE 16 DISCOVERY.  THAT'S

14   DOCUMENT 234, AND IN THAT WE SPECIFICALLY REQUEST, UNDER RULE

15   16(F), FOR EXAMINATION REPORTS, SCIENTIFIC REPORTS, AND WENT

16   THROUGH THINKING OUR GOOD-FAITH BELIEF, SINCE THIS WAS AN

17   ELECTRONIC CASE, EVEN THOUGH THEY HADN'T TOLD US, I'M SURE

18   THEY'VE HAD AN EXPERT LOOK AT ALL OF THEIR ELECTRONIC DATA,

19   AND HIS RESPONSE AT THAT TIME WAS THE GOVERNMENT HAS CONDUCTED

20   NO EXAMINATIONS ON ANY ELECTRONIC MEDIA.

21         THAT WAS APRIL OF 2008, AND I SUSPECT THAT IS

22   ACCURATE AT THAT TIME, THE BEST WE CAN TELL NOW, BUT HE HAS A

23   CONTINUING DUTY OF DISCOVERY, AND THAT'S WHERE THE VIOLATION

24   FALLS.  HE HAS A CONTINUING OBLIGATION TO EITHER ADDRESS IT TO

25   US OR ADDRESS THE COURT ABOUT THAT REPORT.  AND AS WE KNOW,

1    THE REPORT WAS PREPARED IN NOVEMBER OF 2008, AND IT WAS SENT

2    TO AGENT GAYNOR, ACCORDING TO THE DECLARATIONS, GOT THE REPORT

3    OR GOT THE INFORMATION FROM MR. SEVEL.

4          AND AGAIN, THE ONLY THING I'M CHALLENGING, MR. SEVEL,

5    HE'S OBVIOUSLY AN EXPERT.  HE DOES A GREAT JOB.  WE JUST HAVE

6    A DIFFERENT CONCLUSION.  WE HAVE NO QUESTION THAT HIS PROCESS

7    TO GET TO THAT POINT WAS FORENSICALLY CONSISTENT WITH WHAT YOU

8    SHOULD DO.  BUT THE INTERESTING THING ABOUT THE AUTUMN OF '08

9    REPORT IS, IT'S TIM GAYNOR WHO TELLS MR. WEISS, ACCORDING TO

10   THE DECLARATION, THE GOVERNMENT'S PAPERS, THAT THE HARD DRIVE

11   IS WIPED CLEAN AND IT HAS ONLY FRAGMENTARY DATA REMAINING THAT

12   WAS USELESS.

13         AND I DO LATCH ON TO THAT WORD, BECAUSE THE COURT

14   HEARD IT A NUMBER OF TIMES AS THAT ISSUE WENT FORWARD.  MR.

15   WEISS MADE IT, AND I'LL TAKE THIS OPPORTUNITY TO APOLOGIZE.

16   IN MY PAPERS, I QUOTED MR. WEISS DOING A CROSS-EXAMINATION OF

17   CHABALKO, AND IT WAS ME, AND I MESSED UP.  I SHOULDN'T HAVE

18   DONE THAT, AND I APOLOGIZE TO MR. HALPERN FOR IT.  BUT THE

19   COURT WILL RECALL THE MANTRA FOR MR. WEISS, THEY WERE WIPED

20   CLEAN, THEY'RE WIPED, THEY'RE BLANK, THERE'S NO DATA ON IT.

21   THAT IS NOT IN MR. SEVEL'S REPORT.

22         THE COURT:  THAT IT'S WIPED CLEAN, BUT HE DID SAY

23   THERE WERE FRAGMENTS.  BUT DIDN'T MR. WEISS ALWAYS SAY WIPED

24   CLEAN EXCEPT FOR FRAGMENTS?

25         MR. GIBSON:  AT CERTAIN TIMES, HE SAID EXCEPT FOR,

1    AND SOMETIMES HE DIDN'T.  BUT AGAIN, WHAT I THINK THE CONTEXT

2    IS, AND I THINK THIS IS WHAT, HOW IT, THE HARM TO THE COURT.

3    WHEN WE FINALLY GET DOWN TO A HEARING IN JANUARY, 2009, AND

4    THAT WAS A CONTEST OR A HEARING RELATED TO GETTING READY FOR

5    TRIAL AND SOME OTHER DISCOVERY ISSUES THAT MIGHT HAVE BEEN, IN

6    FACT, I THINK IT DID RESULT IN A 30-DAY CONTINUANCE.  BUT IN

7    THAT HEARING, THE COURT, FOR HAVING, HAVING HEARD MR. WEISS

8    TALK ABOUT WIPED CLEAN, FRAGMENT DATA, AND I FILED A VERY

9    SPECIFIC REQUEST IN DECEMBER ASKING FOR ACCESS TO THE SERVERS,

10   ASKING FOR THE REPORTS, IF THERE WERE REPORTS.

11          TWO THINGS ARE IMPORTANT IN HIS RESPONSE.  HE

12   CONTINUED TO SAY, AND MISS KANE SAID, THERE'S NO DATA, THEY'RE

13   WIPED, THEY'RE CLEAN, ONLY USELESS FRAGMENTS.  THEY DO SAY

14   THAT.  HE NEVER TELLS THE COURT, HE HAS NEVER UP TO THAT DATE

15   TOLD THE DEFENDANTS THAT THERE'S A FORENSIC REPORT ANYWHERE

16   AROUND, AND I ASKED FOR IT IN OUR PAPERS BECAUSE, AS AN

17   EXPERIENCED PROSECUTOR AND AS A LAWYER OF THE BAR TRYING CASES

18   IN FEDERAL COURT, I KNOW THAT, WHEN AGENTS LOOK AT COMPUTERS

19   AND FORENSIC STUFF, THEY GENERALLY DO A FORENSIC REPORT.  BY

20   HIS SILENCE, HE OMITS IT, AND HE DOESN'T PRODUCE IT.  AND

21   QUITE FRANKLY, WE DON'T ZERO IN ON THAT AS MUCH AS ACCESS TO

22   THE SERVERS, AND YOU DENIED US ACCESS TO IT.

23          WHAT'S IMPORTANT ABOUT THAT IS, AND I'M NOT SPEAKING

24   FOR THE COURT BECAUSE I THINK THE COURT IS DOING A MARVELOUS

25   JOB KEEPING UP WITH A COMPLEX CASE, MY SENSE IS THAT, AS WE

1  THEN WENT FORWARD INTO TRIAL, THE COURT HAD A SENSE THAT

2  THERE'S REALLY NOTHING ON IT.  IT'S A BLANK PAGE.  THIS IS

3  ANOTHER, I DON'T KNOW, ANOTHER DEFENSE EFFORT TO TRY TO CREATE

4  AN ISSUE WHERE THERE IS NONE, AND IT IS ON THAT BASIS BY WHICH

5  THEN THEY SOUGHT TO INTRODUCE APPLEYARD'S AND PRICER'S DATA

6  AND NOT MEET WITH THE REQUIREMENTS OF 1001, 1003, 1004.  AND

7  HAVING NOT GOTTEN A REPORT, THE COURT OR US HAVING NO CHANCE

8  TO DO THE CHECKING AND VERIFY THAT, WE WENT ALL THE WAY

9  THROUGH THAT TRIAL UNDER A CIRCUMSTANCE WHERE THAT'S NOT QUITE

10  ACCURATE.

11          THE COURT:  AND THE REPORT WOULD HAVE REVEALED OR

12  DOES REVEAL THAT THERE ARE -- IT DOESN'T USE THE WORDS, WIPED

13  CLEAN.  IT DOES TALK ABOUT WHAT'S ON THERE, THESE FRAGMENTS.

14          MR. GIBSON:  IT ABSOLUTELY DOES.

15          THE COURT:  CORRECT?

16          MR. GIBSON:  IT DOES.

17          THE COURT:  AND SO WHAT YOU COULD HAVE DONE IS WHAT

18  YOU'RE DOING NOW:  HIRED AN EXPERT TO SEE WHAT YOU COULD DO

19  WITH THOSE FRAGMENTS.

20          MR. GIBSON:  WELL, THERE ARE A COUPLE OF THINGS THAT

21  ARE IMPORTANT.  I THINK THAT'S WHERE THE HARM IS.  I DON'T

22  THINK THAT THAT'S A -- I THINK THAT DECISION BY MR. WEISS TOOK

23  AWAY THE COURT'S GATEKEEPING REQUIREMENTS UNDER RULE 16 BY HIS

24  DECISION NOT TO EVEN TELL THE COURT ABOUT IT, BECAUSE I THINK

25  IF THAT REPORT HAD BEEN PRODUCED EVEN AS LATE AS 2009, IT

1    WOULD HAVE DONE A NUMBER OF THINGS.  IT WOULD HAVE ALLOWED US

2    TO GET WITH OUR EXPERT AND SAY, IS THIS RIGHT?  AND I WOULD

3    SAY MY EXPERT WOULD HAVE SAID, NO, HE'S NOT.  YOU CAN DO IT.

4    AND WE COULD HAVE BEEN BACK IN THIS COURT IN JANUARY DEALING

5    WITH THIS ISSUE, WANTING TO HAVE ACCESS, PROBABLY ASKING THAT

6    THE GOVERNMENT FINISH THEIR EXAMINATION.

7         THE SECOND THING IS, YOUR HONOR, THERE'S A LOT OF

8    INFORMATION ON THE STRUCTURE AND THE CONFIGURATION OF THE

9    DATA, THE 20 HARD DRIVES THAT MR. SEVEL REVIEWED THAT WOULD

10   HAVE GUIDED OUR EXPERT, MR. FITZGERALD, AS HE WAS WORKING WITH

11   US, AS THE COURT WILL RECALL, IN NOVEMBER AND DECEMBER, AS WE

12   WERE SLUGGING THROUGH DISK 23, TRYING TO GET THOSE QUERIES AND

13   GET THOSE THINGS DONE.  THERE WAS A, IT'S A PLETHORA OF

14   INFORMATION THAT A FORENSIC EXPERT COULD USE TO HELP IT, AND

15   WE WERE DENIED ACCESS TO IT, AND THAT IS HARM BECAUSE IT PUT

16   US BEHIND THE EIGHT-BALL.

17        NOW, THE GOVERNMENT WANTS TO, AND EVEN SOME OF THE

18   OPINIONS TALK LIKE IT'S A, WELL, YOU DIDN'T SHOW THE

19   MATERIALITY.  YOU'RE IN A CATCH-22 OR THE DOG CHASING THE

20   TAIL, AND I HATE TO USE DOGS AGAIN, BUT I CAN'T SAY SOMETHING

21   IS MATERIAL IF I DO NOT KNOW IT EXISTS AND THE GOVERNMENT SITS

22   AT THIS TABLE AND DOESN'T EVEN TELL US OR TELL THE COURT.

23        AND I DO FAULT THE GOVERNMENT FOR NOT GOING TO THE

24   COURT, UNDER THESE RULE 16 QUESTIONS, AND SAYING, YOU KNOW

25   WHAT, YOUR HONOR?  AND I IMAGINE MR. HALPERN WOULD DO THIS

1    NOW, OR HAS DONE IT IN HIS PAST.  HERE'S WHAT I HAVE.  DO IT

2    *IN CAMERA*.  SHOULD I TURN IT OVER OR NOT?  WHAT'S THE COURT'S

3    RULING?  AND LET THE COURT DECIDE.  THAT WAY, MY CLIENT'S AND

4    THE OTHER INDIVIDUAL DEFENDANTS' DUE-PROCESS RIGHTS ARE

5    SOMEWHAT PROTECTED.  BUT MR. WEISS, INDEPENDENT OF THE COURT,

6    MADE THAT DETERMINATION AND HE WENT FORWARD WITH IT.

7            I DO FAULT HIM FOR NOT TRYING TO SEE IF THERE WAS,

8    THAT THAT REPORT WAS IN.  AGAIN, I DON'T THINK IT'S

9    DISPARAGING TO MR. SEVEL, BUT AGAIN ONLY -- I'M NOT

10   TESTIFYING, BUT MY EXPERIENCE IS, THE GOVERNMENT HIRES OUTSIDE

11   CONSULTING FORENSIC PEOPLE TO SOMETIMES DO WORK IN COMPLICATED

12   AREAS.  I BELIEVE THERE'S ONE HERE IN SAN DIEGO THAT RECOVERS

13   FRAGMENTED DATA ON SQL SERVERS AND MYSQL DATABASES AND GETS IT

14   INTO A WORKING FORMAT, AND WE HAVE THEM BACK IN TEXAS.  SO I

15   THINK THE GOVERNMENT HAD RESOURCES AVAILABLE THAT THEY SHOULD

16   HAVE CONCLUDED THAT.

17           AND I'D LIKE TO, IF THE COURT WILL FOLLOW MY

18   ARGUMENT, I'D LIKE TO GO RIGHT TO THAT POINT.  MR. WEISS -- I

19   MEAN MR. HALPERN AND MR. SEVEL STILL SAY TODAY NOTHING CAN BE

20   RECOVERED.  WELL, MR. FITZGERALD, I WANT TO -- I DON'T KNOW.

21   I ASSUME THEY'RE IN THE RECORD BY BEING PART OF MY PLEADINGS,

22   BUT I DO WANT OUR EXHIBITS TO BE PART OF THE RECORD IN THIS

23   CASE.

24           THE COURT:  YES.  THEY'RE ATTACHED AS EXHIBITS.

25           MR. GIBSON:  THE EXERCISE THAT MR. FITZGERALD WENT

1    THROUGH WAS EXACTLY TO ADDRESS THE ISSUE OF MR. SEVEL'S

2    STATEMENT THAT HE COULDN'T RETRIEVE ANYTHING.  EXHIBIT 1 IS A

3    SCREEN CAPTURE JUST LIKE THE SCREEN CAPTURE THAT MR. SEVEL HAS

4    GOT ATTACHED TO HIS DECLARATION WITH NUMBERS AND THEN, OF

5    COURSE, CONFIGURATIONS TO THE RIGHT OF IT.

6              DOES THE COURT HAVE THOSE EXHIBITS?

7              THE COURT:  YES.

8              MR. GIBSON:  THEN, LOOK AT EXHIBIT ONE, AND IT'S

9    THOSE FRAGMENTED -- THOSE ARE FRAGMENTS, AND THEY'RE ON THE

10   HARD DRIVE, AND SO WHAT MR. FITZGERALD DID, WHICH A COMMERCIAL

11   COMPANY COULD DO MORE RAPIDLY, AT GREAT COST, BUT HE THEN TOOK

12   THAT EXHIBIT, NO. 2, AND SAID, OKAY, THESE FRAGMENTS ARE KIND

13   OF LIKE BOXES IN THE WAREHOUSE, BOXES ON THIS HARD DRIVE.  LET

14   ME SEE IF I CAN FIND WHERE THE REST OF THE BOXES ARE.  BECAUSE

15   WHAT HAS HAPPENED TO THE HARD DRIVE IS THAT ITS FORMAT OR ITS

16   INDEX OF WHERE THINGS ARE STORED HAS BEEN REMOVED, AND SO ONE

17   OF THE THINGS OF RECONSTRUCTION IS TO TRY TO PUT THE FORMAT

18   BACK TOGETHER SO YOU CAN GO FIND ALL OF THE DIFFERENT

19   FRAGMENTS.

20             AND SO IF YOU LOOK AT EXHIBIT 2, 3, AND 4, AND I HAD

21   TO DO IT THAT WAY BECAUSE OF THE STRING, THESE ARE OFF OF THE

22   APPLEYARD HARD DRIVE, DISK 56, GOVERNMENT'S EXHIBIT 56, AND

23   WHAT HE WAS ABLE TO DO AT THE ONE THAT IS HIGHLIGHTED, YOU CAN

24   SEE, IF YOU GO BACK TO NUMBER ONE, THAT RX NUMBER, RX 474814,

25   IS AT THE VERY TOP OF THAT MIDDLE BLOCK OF DATA.  AND AS MR.

1    FITZGERALD SAYS IN HIS AFFIDAVIT, HAVING WORKED ON THIS CASE

2    FOR US FOR A YEAR, THAT APPEARED TO BE, AND I THINK SEVEL

3    SAYS, THAT THAT'S DATA THAT IS CONSISTENT WITH WHAT YOU WOULD

4    SEE ON PRICER AND APPLEYARD.

5         AND HE TAKES THAT DATA, ALL OF THAT BLOCK, BUT USING

6    THAT EXAMPLE THERE, AND THEN HE RUNS IT THROUGH THE APPLEYARD

7    MYSQL SERVER AND HUNTS AND PULLS AND DOES IT WITH SOME

8    FORENSIC TOOLS, NOT THE KIND THAT COULD DO THIS WHOLE

9    DATABASE, AND THEN HE FINDS THAT ON THAT DATABASE, DIRECTLY

10   LINKED TO IT, APPLEYARD'S HARD DRIVE, IS IN FACT THESE

11   FRAGMENTS, THIS FRAGMENT THAT IS PART OF EXHIBIT NO. 1.

12        AND WHAT'S INTERESTING ENOUGH, IF THE COURT WOULD

13   TAKE, AND IT WILL, THE SCREEN ABOVE AND THE SCREEN BELOW,

14   ORDER 759760, 761, THOSE ARE TWO BLOCKS OF DATA, AND IF THE

15   COURT WILL LOOK BACK AT EXHIBIT 1, RIGHT AT THE TOP OF THE

16   PAGE IS A DATA BLOCK, WHICH IS LIMITED BY THE PICTURE THAT HE

17   CAN TAKE, THAT MATCHES UP TO ORDER 759.  AND THEN BELOW THERE

18   IS ANOTHER DATA GROUP WITH RX 938, AND IF YOU LOOK BELOW THE

19   STRING, YOU WILL SEE RX 938.  THAT IS EXHIBIT 1171, AND SO

20   IT'S PRINTED OUT.

21        NOW, THE POINT OF ALL OF THIS EXERCISE, YOUR HONOR,

22   IS TO DEMONSTRATE EVIDENTIALLY THAT THERE IS DATA THAT CAN BE

23   ACCESSED, CAN BE RETRIEVED AND PUT INTO A FORMAT THAT WOULD BE

24   USEFUL AND HELPFUL, AND ONE CONFIRMING THE COMPLETENESS OF THE

25   DAMAGED APPLEYARD EXHIBIT, BECAUSE IT'S GOT A PART NOW, WE'VE

1    LEARNED LATER AGAIN, THAT WAS CORRUPTED, AND TO CHECK THE

2    PRICER HARD DRIVE.

3         AND WHAT'S BETTER ABOUT THE SERVERS, YOUR HONOR, IS

4    THAT -- ISN'T IT INTERESTING?  THAT'S THE ONLY FORENSIC -- I

5    MEAN, THAT'S THE ONLY ELECTRONIC MEDIA THAT THE GOVERNMENT GOT

6    A FORENSIC REPORT ON.  MR. PRICER'S DISK WAS NEVER EXAMINED,

7    UNLESS THEY'VE GOT A REPORT THEY HAVEN'T SHOWN US, EXAMINED BY

8    A FORENSIC EXPERT TO BE SURE THE PROTOCOL WAS RIGHT.  THAT'S

9    THE HARD DRIVE OFF A CITIZEN'S, PRODUCED OFF THE HARD DRIVE OF

10   A CITIZEN, MR. PRICER, AND THE GOVERNMENT DID NO CHECKING TO

11   SEE IF IT WAS FORENSICALLY CORRECT, AND THE SAME GOES FOR MR.

12   APPLEYARD'S HARD DRIVE.

13        SO, REALLY, THE BEST EVIDENCE IS THE ONE THAT'S BEEN

14   FORENSICALLY EXAMINED AND YOU'VE DONE THE PROTOCOLS THAT THE

15   DEPARTMENT OF, DOD AND DOJ REQUIRE PEOPLE TO DO.  BUT THE

16   POINT IS, THAT'S EVIDENCE, AND THE OTHER EXHIBITS --

17        THE COURT:  SO YOU'RE SAYING THAT THIS COULD BE USED

18   TO DOUBLECHECK THE ACCURACY.

19        MR. GIBSON:  THERE'S TWO ASPECTS ABOUT IT, IF WE CAN

20   GET ACCESS.  IT CAN BE USED TO CHECK THE TESTIMONY OF THE, AND

21   THE ACCURACY, THE CORRECTNESS OF THE EXHIBITS AND THE, OF THE

22   TWO BIG EXHIBITS, AND THEN ANY EXHIBIT THAT THE GOVERNMENT

23   MIGHT MANIPULATE AND PULL DOWN ON IT.

24        THE SECOND THING, THOUGH, THAT'S REAL IMPORTANT, AND

25   AGAIN THIS IS THE SAME CATCH-22 I'M IN.  IF THIS IS IN FACT A

1    PART OF THE AFFPOWER PRODUCTION SERVERS, THERE SHOULD BE AND

2    MAY BE INFORMATION ABOUT, POTENTIALLY, OTHER COMMUNICATIONS,

3    LIKE E-MAILS.  THERE WILL BE CODE.  THERE WILL BE OTHER,

4    MAYBE, SQL SERVER INFORMATION, OTHER DATA THAT MIGHT, HAD WE

5    HAD THE OPPORTUNITY TO LOOK AT IT OR DO SOMETHING WITH, WOULD

6    HAVE BEEN CROSS-EXAMINATION MATERIAL FOR THE VARIOUS

7    WITNESSES.

8            BUT I'M ARGUING THAT IN A VACUUM, YOUR HONOR.  I DO

9    NOT KNOW, AND THAT'S WHY THE HARM, THE DUE-PROCESS HARM TO OUR

10   CLIENTS IS THAT THE GOVERNMENT'S DECISION AT THAT POINT IN

11   TIME TO CONTINUE TO USE THIS MANTRA OF WIPED CLEAN WAS, IF IT

12   WASN'T FLAGRANT, IT WAS A CLEARLY RECKLESS DISREGARD FOR THE

13   ACCURACY OF IT, AND WE ALL THEN FELL INTO THE BELIEF THERE'S

14   NOTHING THERE.

15           THE COURT:  SO YOU WOULD HAVE BEEN ABLE TO HIRE

16   SOMEBODY.  WOULD YOU HAVE GONE ON TO HIRE SOMEBODY?

17           MR. GIBSON:  I DON'T KNOW.  AT THAT TIME, I THINK WE

18   MIGHT HAVE.  I DON'T KNOW.  I UNDERSTAND THAT IT'S EXPENSIVE

19   AND IT'S A COMPLEX PROCESS.  I DON'T KNOW THAT WE WOULD HAVE,

20   BUT I DIDN'T EVEN GET THE OPPORTUNITY TO MAKE THAT DECISION OR

21   THAT CALL OR TO GIVE THAT ADVICE TO MY CLIENT ABOUT SPENDING

22   SOME MONEY TO DO IT, AND THAT'S, THEREIN LIES, THAT'S THE

23   ADDITIONAL OR THE PRIMARY HARM.

24           AS IT RELATES DOWN, YOUR HONOR, TO THE ISSUES RELATED

25   TO THE APPLEYARD HARD DRIVE, THERE'S ONLY A COUPLE POINTS

1   THERE, AND I'LL LET MISS KENNEDY OR MR. BRODEN ADDRESS THAT

2   ISSUE.  BUT WHAT'S IMPORTANT, IN MY VIEW, FOR THE COURT TO

3   DECIDE WHETHER THIS PATTERN OF CONDUCT IS IN FACT WILLFUL,

4   FLAGRANT, OR RECKLESS IS, ONCE AGAIN, MR. WEISS MADE THE

5   DECISION, JUST AS MR. HALPERN SAID, I, MR. WEISS, I'M GOING TO

6   DECIDE NOT TO TELL ANYBODY ABOUT IT.  I'M NOT GOING TO GIVE IT

7   TO THE DEFENDANTS.  I'M NOT GOING TO TELL THE COURT.  I'M

8   GOING TO PUT IT IN MY SACK AND CLOSE THE TOP OF IT.  AND NOW

9   WE KNOW IT'S BEFORE TRIAL, NOT EVEN DURING TRIAL, WHERE HE

10  SUGGESTED IT AT OUR DECEMBER HEARING.  OKAY?  AND I CONCEDE

11  THAT HE'S HAD HIS MEMORY REFRESHED AND THAT'S WHERE IT IS.

12          WELL, THE FIRST THING IS, THAT'S DISCOVERY THREE

13  MONTHS BEFORE TRIAL, AND IT SHOULD HAVE BEEN LOOKED AT AND

14  SHOULD HAVE BEEN BROUGHT TO THE COURT'S ATTENTION.  THE

15  PROBLEM IS, YOUR HONOR, THAT THAT DATA, WHETHER MR. HALPERN

16  THINKS IT'S IMPORTANT OR NOT, THAT DATA INDICATES TO A

17  FORENSIC PERSON THAT MAYBE APPLEYARD'S HARD DRIVE IS NOT

18  COMPLETE, THAT A SERVER OR A PLATE DIDN'T MOUNT CORRECTLY, AND

19  YET WE HAD NO OPPORTUNITY TO TAKE THAT ISSUE AND PRESENT IT TO

20  A FORENSIC EXPERT, OR TALK ABOUT IT, BECAUSE WE DON'T KNOW

21  ABOUT IT.

22          AND THEN THE SECOND THING IS, TALKING ABOUT THE HARM,

23  THE COURT WILL RECALL -- MR. HALPERN WASN'T THERE.  YOU'LL

24  REMEMBER, NEAR THE END OF TRIAL, AS WE STARTED, WE FINALLY GOT

25  ALL THE EXHIBITS AND THE AIRPLANE WING IN HERE, THAT THE

1    GOVERNMENT HAD TO COME IN HERE AT THE END OF TRIAL AND THEY

2    CHANGED SOME OF THE DATA ON THEIR EXHIBITS BECAUSE IT HAD,

3    THEY DISCOVERED THAT, IN WORKING THROUGH IT, IT WASN'T

4    ACCURATE, IT WASN'T CORRECT, AND THEY WANTED IT TO BE CORRECT

5    GOING TO THE JURY.

6           WELL, YOUR HONOR, AT THAT POINT IN TIME, WE SHOULD

7    HAVE BEEN TOLD ABOUT THESE OTHERS SO THAT WE COULD HAVE HAD AN

8    OPPORTUNITY TO SEE IF IT IMPACTED THEIR CHANGES, AND IT'S THAT

9    MENTAL, THAT MINDSET, I, MR. WEISS, DECIDE THE DEFENDANTS AND

10   THE COURT ARE GOING TO BE DENIED ACCESS TO IT, THAT IS

11   DEMONSTRATIVE OF THE WAY HE ADDRESSED THE SERVERS AND THE

12   FORENSIC REPORT.

13          AND I KNOW IT'S HARSH, BUT I'M TELLING YOU THE

14   GOVERNMENT HAS TO HAVE CONSEQUENCES.  THE COURT IS EXACTLY

15   RIGHT.  THEY TOOK THIS CASE ON.  THEY TOOK IT TO THE GRAND

16   JURY.  IT'S A COMPLEX CASE, AND THEY'RE ACCOUNTABLE AND

17   RESPONSIBLE FOR DOING IT PROPERLY, AND I THINK THEY FELL SHORT

18   OF THAT GOAL.  IT'S NO REFLECTION ON THESE LADIES AND

19   GENTLEMEN HERE, BUT IT IS IN FACT A CONSEQUENCE THAT THE

20   GOVERNMENT NEEDS TO BE PUNISHED WITH FOR WHAT THEY DID.

21          THE COURT:  THANK YOU.

22          MR. BRODEN.

23          MR. HALPERN:  YOUR HONOR, PERHAPS THIS IS A GOOD TIME

24   IF I COULD APPROACH THE BENCH, WITH MR. GIBSON OR CO-COUNSEL.

25   I'D LIKE TO DO SO JUST FOR A BRIEF MOMENT.

1          MR. BRODEN:  THAT SOUNDS LIKE FUN.

2          MR. GIBSON:  WE HAVEN'T HAD A SIDE-BAR IN MONTHS,

3     YOUR HONOR.

4          THE COURT:  I KNOW.

5          I MEAN, WITH EVERYBODY?

6          MR. HALPERN:  IT'S REALLY JUST FOR MR. GIBSON.  IF

7     EVERYBODY WOULD LIKE TO COME, THAT'S FINE.  I DON'T DO THIS

8     LIGHTLY.  I NORMALLY DON'T GO TO SIDE-BAR, BUT I THINK IT

9     MIGHT BE PERTINENT TO THIS CASE, YOUR HONOR.

10          THE COURT:  OKAY.

11          (AT THE BENCH)

12          MR. HALPERN:  I WANTED TO COME OVER HERE BEFORE ANY

13     DAMAGE WAS DONE.  WE JUST FOUND OUT ABOUT THIS.  I DON'T THINK

14     THIS WAS DONE DELIBERATELY.  IT CLEARLY WASN'T.  WE HAVE

15     THINGS LIKE THIS.  MISTAKES HAPPEN ACCIDENTALLY, BUT WE'RE

16     MAKING THIS PART OF THE RECORD.  IT HAS ALL THE CREDIT-CARD

17     INFORMATION IN IT.  IT'S FILED PUBLICLY.  I DIDN'T WANT TO SAY

18     IT IN COURT.

19          MR. GIBSON:  I HAVE NO PROBLEM REDACTING OR FILING IT

20     UNDER SEAL.

21          THE COURT:  WE'LL FILE IT UNDER SEAL.

22          MR. HALPERN:  I'M JUST SAYING IT'S AN ACCIDENT.

23          MR. BRODEN:  THAT WASN'T NEARLY AS MUCH FUN AS I

24     THOUGHT IT WOULD BE.

25          (END OF BENCH CONFERENCE)

1        THE COURT:  MR. BRODEN.

2        MR. BRODEN:  YOUR HONOR, I DON'T REALLY HAVE MUCH TO

3   ADD, EXCEPT TO SORT OF DEFEND MY MATH SKILLS, BECAUSE ONE AND

4   ONE EQUAL TWO IN MY WORLD.

5        AS TO MY PLEADING, THE PURPOSE WAS REALLY IN SUPPORT

6   OF MR. GIBSON'S PLEADINGS AND THE OVERALL CONDUCT BY MR. WEISS

7   IN THIS CASE, AND I BROUGHT TWO THINGS TO THE COURT'S

8   ATTENTION.  THE COURT WILL, OF COURSE, REMEMBER DURING TRIAL

9   THE ADMONISHMENTS TO MR. WEISS ABOUT THE FACT THAT HE WAS

10  ISSUING TRIAL SUBPOENAS AND GETTING DOCUMENTS AND THEN NOT

11  TURNING THOSE DOCUMENTS OVER.

12       BUT WITH REGARD TO MR. FISHER, ONE THING THE COURT

13  WILL RECALL IS HOW MUCH MR. WEISS USED THE RX AFFILIATE FORUM

14  DURING TRIAL, AND THE COURT WILL RECALL MR. FISHER TESTIFIED

15  THAT HE PULLED MR. WEISS'S SCREEN NAMES, AND I'LL LEAVE IT UP

16  TO THE COURT TO DETERMINE WHETHER MR. WEISS'S STORY THAT HE

17  HAD FORGOTTEN ABOUT THAT IS BELIEVABLE OR NOT.  I SUBMIT IT

18  WASN'T IN LIGHT OF THE EFFORT MR. WEISS PUT INTO DISSECTING

19  THE RX AFFILIATE FORUM, AND I SUBMIT TO THE COURT THAT HE LIED

20  TO THE COURT ON THAT.

21       AND WITH REGARD TO THE E-MAILS THAT MR. FISHER SENT

22  AND INSPECTOR DAMONE AND TO MAKE IT SEEM LIKE INSPECTOR DAMONE

23  IS NOT PART OF THIS CASE, HE ACTUALLY TESTIFIED AS A WITNESS

24  IN THE CASE, BUT HERE'S SOMETHING THAT SHOULD CONCERN THE

25  COURT.  IF INSPECTOR DAMONE DOESN'T HAVE THAT PARTICULAR

1    E-MAIL THAT WE KNEW EXISTED AND WENT ON A SEARCH FOR, HOW MANY

2    OTHER E-MAILS ARE MISSING IN THIS CASE?  I DON'T KNOW.  I

3    SUBMIT TO YOU THAT NOBODY REALLY KNOWS EXCEPT THE INDIVIDUAL

4    AGENTS, BUT APPARENTLY SOME E-MAILS HAVE DISAPPEARED THAT

5    SHOULD HAVE BEEN TURNED OVER, THE GOVERNMENT CONCEDES, AS

6    JENCKS.  THAT'S ISSUE NUMBER ONE.

7         WITH REGARD TO THE BRIDGERS REPORT, AND THIS IS WHERE

8    MATH BECOMES SOMEWHAT IMPORTANT, BRIDGERS TESTIFIED AS TO UPC

9    PHARMACY, TAFTVILLE PHARMACY, RED MESA PHARMACY, KWIC FILL

10   PHARMACY, OVER DEFENSE OBJECTIONS THAT IT'S COMPLETELY

11   IRRELEVANT TO THE CASE, AND YET HE HAS SEVERAL 302S AND

12   HUNDREDS OF PAGES OF AFFIDAVITS RELATED TO THAT VERY

13   TESTIMONY, AND THEN FOR MR. HALPERN TO COME UP AND SAY IT'S

14   ONE SNIPPET OF A PAGE IS JUST NOT CORRECT.  IT'S NUMEROUS

15   PAGES ABOUT TAFTVILLE, QUICKFILL, UPC, RED MESA, THAT WASN'T

16   TURNED OVER IN THE JENCKS MATERIAL.

17        AND IT HAS OCCURRED TO ME IN LISTENING TO ALL THIS,

18   AND HERE'S HOW WE SHOULD HAVE FOUND OUT ABOUT THE A2 LONG

19   BEFORE A COUPLE MONTHS AGO, IN ADDITION TO THE FORENSIC

20   REPORT.  THE E-MAILS FROM BRIDGERS TO WEISS ARE JENCKS

21   MATERIAL THAT WEREN'T TURNED OVER.  IT TALKS ABOUT HIM

22   ACCESSING THE A2 SERVER BACK IN JANUARY.  THOSE E-MAILS WERE

23   NEVER TURNED OVER.  HAD THE JENCKS MATERIAL BEEN PRODUCED ON

24   BRIDGERS CORRECTLY, WE WOULD HAVE KNOWN THIS BY BRIDGERS' OWN

25   E-MAILS.  IT'S CLEARLY RELATED TO HIS TESTIMONY REGARDING HIS

1    PUTTING TOGETHER THE BACK END AND WORKING WITH THE DATABASES,

2    AND THIS IS JENCKS MATERIAL NOT TURNED OVER.

3         SO IT REALLY BECOMES JUST A PATTERN, AND I THINK, YOU

4    KNOW, ONE, TWO ISOLATED MISTAKES YOU PUT OFF TO THE FACT THAT

5    MR. WEISS WAS OVERWHELMED ON THIS, ALTHOUGH THAT'S A CHOICE

6    THE GOVERNMENT MADE, AND THE GOVERNMENT'S THE PARTY, NOT MR.

7    WEISS, THE GOVERNMENT CHOSE TO SADDLE MR. WEISS, PERHAPS

8    UNFAIRLY, WITHOUT ADEQUATE HELP.  BUT WHEN YOU PUT TOGETHER

9    THE ENTIRE PICTURE OF WHAT WENT ON DURING TRIAL, WHETHER YOU

10   BELIEVE MR. WEISS THAT HE DOESN'T, HE DIDN'T REMEMBER FISHER

11   TELLING HIM HIS SCREEN NAME, ALL THIS JENCKS MATERIAL THAT'S

12   NOT BEEN TURNED OVER, THEN IT DOES RISE TO THE LEVEL OF

13   RECKLESSNESS.

14        AND AT LEAST AS FAR AS PREJUDICE GOES, IT'S FINE FOR

15   MR. HALPERN TO COME UP AND SAY, WELL, MR. GIBSON, TAKE FOUR OR

16   FIVE MONTHS MORE TIME, BUT MY CLIENT, MR. BIDWELL, HAS ALWAYS

17   ASKED FOR A SPEEDY TRIAL, AND THAT'S WHERE THE PREJUDICE GOES.

18   HAD THIS BEEN TURNED OVER WAY BACK WHEN, WE COULD HAVE MOVED

19   ALONG.  BUT TO SUGGEST THAT MR. BIDWELL'S SPEEDY-TRIAL RIGHTS

20   BE FURTHER DELAYED BECAUSE THE GOVERNMENT HASN'T COMPLIED WITH

21   ITS OBLIGATIONS, AND THE GOVERNMENT ADMITS IT HASN'T COMPLIED

22   WITH ITS OBLIGATIONS AS FAR AS JENCKS AND DISCOVERY, THERE IS

23   PREJUDICE.

24        THANK YOU.

25        THE COURT:  THANK YOU.

1          MISS KENNEDY.

2          MS. KENNEDY:  GOOD MORNING, YOUR HONOR.

3          THE COURT:  GOOD MORNING.

4          MS. KENNEDY:  FIRST OF ALL, I'M GOING TO LEAVE THE

5   SERVER ISSUE TO MR. GIBSON, BUT I DO WANT TO ADD -- I DON'T

6   WANT TO BELABOR THE POINT, BUT I DO WANT TO POINT OUT THAT IN

7   THE FORENSIC REPORT ITSELF IT NEVER MENTIONS WIPED CLEAN, BUT

8   IT ALSO NEVER MENTIONS THAT THERE IS USELESS DATA ON THERE, ON

9   THE SERVERS.  IT INDICATES WHAT DATA IS ON THERE, AND I THINK

10  IF THIS REPORT WOULD HAVE BEEN TURNED OVER, AS MR. GIBSON

11  SAID, HE COULD HAVE HAD AN EXPERT LOOK AT IT TO DETERMINE

12  WHETHER OR NOT WIPED CLEAN UNDER MR. WEISS'S DEFINITION OR

13  WHAT HE PORTRAYED WAS WIPED CLEAN IS THE SAME THING AS WHAT'S

14  IN THIS FORENSIC REPORT, AND IT'S NOT.

15          AS FAR AS, YOU KNOW, OF COURSE, AS THE COURT IS WELL

16  AWARE, I WAS NOT HERE AT THE FIRST TRIAL, BUT READING THE

17  TRANSCRIPTS, READING ALL OF THE PLEADINGS, IT'S APPARENT THAT

18  THERE IS A PATTERN OF MISCONDUCT, A PATTERN OF

19  MISREPRESENTATIONS, REGARDING THE DISCOVERY ISSUES.  I MEAN,

20  IT LASTED ALL THE WAY UP UNTIL DECEMBER OF LAST YEAR, WHEN MR.

21  WEISS TELLS THIS COURT, HE TELLS THIS COURT THAT MISS KANE WAS

22  THE ONE THAT FOUND OUT THROUGH AGENT BRIDGERS THAT THE A2 DATA

23  ACTUALLY EXISTED AND SHE DIDN'T FIND OUT UNTIL TRIAL, WHICH IS

24  COMPLETELY INCORRECT.

25          THE COURT HAS THE JANUARY 22ND E-MAIL, AND THE COURT

1    HAS OUR PLEADINGS.  YOU KNOW, FROM WHAT I UNDERSTAND OF

2    READING THE TRANSCRIPTS, FROM READING THE TRIAL, AND HOW IT

3    ALL WENT DOWN, THESE DEFENDANTS WERE ALMOST CONVICTED ON THIS

4    ELECTRONIC DATA, ON THE DATA THAT WAS GIVEN TO THEM, THE DATA

5    THAT THEY DETERMINED, THE GOVERNMENT DETERMINED WHAT WAS

6    MATERIAL.

7            THE GOVERNMENT HUNG THEIR HAT ON THE MEDICAL-DECLINE

8    RATE FOR THE AFFILIATES AS TO WHY THEY SHOULD HAVE KNOWN THAT

9    THIS WAS ILLEGAL, OR THAT THIS WAS WRONG, OR THIS WASN'T

10   KOSHER.  THE PROBLEM WITH THAT IS, DURING TRIAL, FROM WHAT I

11   UNDERSTAND, THE AFFILIATES TRIED TO POINT OUT TO THE JURY,

12   WELL, WAIT A MINUTE.  THAT'S NOT WHAT WE LOOKED AT.  WE LOOKED

13   AT TRAFFIC CONVERSION RATES.  THAT IS WHAT WE WERE CONCERNED

14   WITH.

15           WITH THIS NEW INFORMATION, THIS NEW A2 INFORMATION

16   THAT THEY FOUND OUT ABOUT IN JANUARY, THERE COULD HAVE BEEN

17   ANOTHER ANALYSIS OF THE BACK END OR WHAT THE AFFILIATES COULD

18   HAVE SEEN, THAT MAYBE THEY COULD HAVE PRESENTED, WAIT A

19   MINUTE, THERE ARE CANCELED ORDERS, THERE'S A CERTAIN NUMBER OF

20   CANCELED ORDERS, THERE'S A CERTAIN NUMBER OF CREDIT-CARD

21   DECLINES, AND THAT'S IMPORTANT BECAUSE THEY WEREN'T ABLE TO

22   PRESENT THAT.

23           NOW, THE GOVERNMENT NOW SAYS, WELL, IT WAS EXACTLY

24   THE SAME AS WHAT WAS ON THE PRICER DVDS.  WELL, OUR ARGUMENT

25   IS THAT IT'S BRADY AND JUST BY GIVING IT TO US IS NOT ENOUGH.

1    THEY HAVE TO ACTUALLY SHOW US HOW TO GET TO IT AND WHAT IT IS,

2    AND IF THEY DON'T, THEN HOW ARE WE SUPPOSED TO KNOW ABOUT IT?

3         THE COURT:  WAIT.  SO YOU'RE SAYING THAT JUST TURNING

4    IT OVER ISN'T SUFFICIENT.

5         MS. KENNEDY:  CORRECT, CORRECT, AND I KNOW THAT THERE

6    WAS, OR I BELIEVE -- I SHOULDN'T SAY I KNOW, BECAUSE I WASN'T

7    HERE, BUT I BELIEVE THAT THERE WERE SOME ISSUES BACK IN THE

8    FIRST TRIAL AS TO ACCESS TO SOME OF THE DATA, AND AFTER A LONG

9    PERIOD OF TIME -- I DON'T KNOW IF IT WAS MR. GIBSON, OR I

10   DON'T KNOW WHO IT WAS -- THEY ATTEMPTED TO SIT DOWN WITH SOME

11   AGENTS TO SHOW THEM HOW TO ACCESS THE DATA, BUT THE A2 DATA

12   FOR MR. APPLEYARD'S HARD DRIVE WAS STILL AT THAT TIME NOT

13   TURNED OVER AND NOT DIVULGED.

14        IT DOESN'T STOP AT JUST TURNING IT OVER, ESPECIALLY

15   WHEN WE TALK ABOUT CONVERSION RATES AND MEDICAL-DECLINE RATES,

16   BECAUSE THAT'S WHAT THE GOVERNMENT TRIED TO SAY, OKAY, WAIT A

17   MINUTE.  THE AFFILIATE MARKETERS SHOULD HAVE KNOWN BECAUSE

18   THEY SHOULD HAVE SEEN THE MEDICAL-DECLINE RATE.  BUT FROM WHAT

19   I UNDERSTAND AGAIN, YOUR HONOR, THROUGHOUT THE WHOLE TRIAL,

20   THAT'S NOT WHAT THEIR ARGUMENT WAS.  THAT'S NOT WHAT THE

21   AFFILIATES' ARGUMENTS WERE.

22        THEY NEEDED CREDIBLE EVIDENCE, AND THIS A2 DATA WAS

23   CREDIBLE EVIDENCE THAT THEY COULD HAVE KNOWN, BASED ON THEIR

24   TRAFFIC CONVERSION RATES, THAT IT WASN'T JUST ABOUT THE

25   MEDICAL-DECLINE RATE.  IT WAS ALSO ABOUT THE ABANDONED ORDERS,

1    THE INCOMPLETE ORDERS, THE CREDIT-CARD DECLINES, AND ACTUALLY

2    WE DON'T EVEN KNOW WHAT ELSE IS ON THAT A2 DATA BECAUSE IT

3    HASN'T BEEN EXAMINED FURTHER, OR THAT WE KNOW OF.  WE DON'T

4    HAVE ACCESS TO IT, OR I GUESS MR. HALPERN ACTUALLY DID SEND

5    THAT OVER, I THINK, IN THE LATEST DISCOVERY, OR A COUPLE

6    MONTHS AGO, BUT --

7              THE COURT:  THE A2 DATA.

8              MS. KENNEDY:  YES, THE A2/APPLEYARD DATA.

9              THE COURT:  DATA.

10             ANYTHING ELSE?

11             MS. KENNEDY:  YES, YOUR HONOR.

12             I JUST ALSO -- I GUESS THE PATTERN THAT WE'RE TALKING

13   ABOUT BY PREVIOUS GOVERNMENT COUNSEL, IF THE COURT, AND THE

14   COURT WAS HERE.  THE COURT IS WELL AWARE OF HOW IT TRANSPIRED

15   THROUGHOUT THE TRIAL AND HOW MANY TIMES GOVERNMENT COUNSEL HAD

16   TO BE TOLD, WELL, YOU KNOW, THIS IS NOT RIGHT.  YOU NEED TO

17   TURN THIS OVER, OR YOU DON'T NEED TO TURN THIS OVER, OR WHY

18   ARE WE JUST HEARING ABOUT THIS NOW?

19             I MEAN, YOU KNOW, YOUR HONOR, THEY TOOK THAT ABILITY

20   OF GATEKEEPING AWAY FROM YOU BY DECIDING, LIKE MR. GIBSON

21   SAID, WHAT WAS MATERIAL, WHAT THEY SHOULD TURN OVER, WHAT THEY

22   COULD TURN OVER, AND YOU SHOULD, UNDERSTANDABLY, BE UPSET.

23   AND IF WE DON'T DO ANYTHING ABOUT IT, THEN IT'S GOING TO BE

24   OKAY IN THE SOUTHERN DISTRICT OF CALIFORNIA, HERE IN SAN

25   DIEGO, FOR GOVERNMENT COUNSEL, MAYBE NOT THESE PEOPLE, BUT

1   IT'S GOING TO BE OKAY FOR THEM TO WITHHOLD EVIDENCE, AND

2   THAT'S, THAT'S NOT, THAT PREJUDICES NOT ONLY THESE DEFENDANTS,

3   BUT ALL THE DEFENDANTS THAT COME FORWARD IN THIS COURT.

4           THE COURT:  THANK YOU.

5           MS. KENNEDY:  THANK YOU.

6           THE COURT:  MR. ELLIS OR MR. JOHNSTON, ANYTHING?

7           MR. JOHNSTON:  YOUR HONOR, THERE IS ONE AREA THAT I

8   THINK DID NOT GET DISCUSSED CONCERNING PREJUDICE.  I'D BE

9   HAPPY TO ADDRESS THAT.

10          THE COURT:  YES.

11          MR. JOHNSTON:  THANK YOU.

12          MR. GIBSON:  FOR THE RECORD, MR. JOHNSTON AND MR.

13  ELLIS CONTRIBUTED TO THAT PORTION IN OUR PAPERS, BECAUSE HE IS

14  THE ONE WHO UNDERSTANDS THE RULE, AND HE DID A GREAT JOB.

15          MR. JOHNSTON:  WELL, MR. GIBSON IS REFERRING TO THE

16  BEST-EVIDENCE RULES AND THE THOUSAND SERIES, AND I THINK THAT

17  WHILE THERE CERTAINLY IS A PREJUDICE THAT THE DEFENSE DIDN'T

18  HAVE THE OPPORTUNITY TO PERHAPS INVESTIGATE THE ORIGINAL DATA,

19  SERVER INFORMATION, TO BETTER CROSS-EXAMINE THE WITNESSES, I

20  THINK A MORE PERVASIVE AND FUNDAMENTAL PREJUDICE IN THIS CASE

21  IS THAT THE NEAR PROSECUTION OF EVERY DEFENDANT ON EVERY COUNT

22  WAS BASED ON A SUBSTANTIAL AMOUNT OF ELECTRONIC EVIDENCE THAT

23  CAME FROM THE PRICER/APPLEYARD DATA SOURCES, AND I THINK THAT

24  THAT EVIDENCE WAS INADMISSIBLE UNDER THE 1001 SERIES, THE

25  ORIGINAL WRITING RULE, AS SOME, I GUESS, SCHOLARS SAY IT

1    SHOULD BE REFERRED TO, RATHER THAN AS BEST EVIDENCE.

2           THE GOVERNMENT HAS MADE A COUPLE OF ARGUMENTS IN ITS

3    LATEST BRIEFING OF YESTERDAY, OR THE DAY BEFORE, THAT I WOULD

4    LIKE TO ADDRESS.

5           FIRST, THEY SAY THAT THE PRICER/APPLEYARD DATA SHOULD

6    BE CONSIDERED THE ORIGINAL UNDER 1001, SUBSECTION (3).

7    HOWEVER, AN ORIGINAL IS DEFINED UNDER 1001 AS, IF DATA ARE

8    STORED IN A COMPUTER OR SIMILAR DEVICE, ANY PRINTOUT OR OTHER

9    READABLE BY SIGHT SHOWN TO REFLECT THE DATA ACCURATELY CAN

10   THEN BE CONSIDERED TO BE AN ORIGINAL.

11          WE WANTED TO CONTRAST WHAT AGENT BELLIS DID AT THE

12   VERY BEGINNING OF THE TRIAL AND THE TESTIMONY HE PRESENTED

13   WITH WHAT THEY'RE CALLING AN ORIGINAL FROM THE

14   PRICER/APPLEYARD DATA.  AGENT BELLIS SAID, LOOK, I HAD THE

15   SERVER UP AND RUNNING.  I WAS LOOKING AT THE COMPUTER, AND

16   WHEN I SAW SOMETHING I WANTED, I PRINTED IT.  I DOWNLOADED IT.

17   WHAT HE DID WAS, HE BASICALLY CREATED AN ORIGINAL BY LOOKING

18   AT THE ACTUAL SERVER THAT WAS RUNNING AND PRINTING IT.

19          AT LEAST UNDER THE BEST-EVIDENCE RULE, THAT WOULD BE

20   ADMISSIBLE EVIDENCE.  BUT THE GOVERNMENT SAYS, WELL,

21   PRICER/APPLEYARD, THEIR, YOU KNOW, THEIR HARD DRIVE AND THEIR

22   DVD ARE ESSENTIALLY THE SAME THING.  BUT THEY'RE NOT, BECAUSE

23   IT'S MISSING THAT STEP THAT THE RULE REQUIRES TO DEMONSTRATE

24   THAT THE DATA WAS ACCURATELY RECORDED.

25          PRICER AND APPLEYARD CAN ONLY SAY, WELL, YEAH, WE

1    COPIED THE SERVER ONTO THE DATA -- WE COPIED THE SERVER ONTO A

2    HARD DRIVE.  WE COPIED IT ONTO A DVD.  BUT NEITHER OF THEM

3    COULD SAY, AND TO THE EXTENT THAT I THINK THE GOVERNMENT CITES

4    A TRANSCRIPT EXCERPT WHERE APPLEYARD SAYS HE DID THIS, IT'S

5    IMPOSSIBLE.  THEY CANNOT SAY, I COPIED THAT ENTIRE SERVER, AND

6    THEN I LOOKED AT THE SERVER TO SEE THAT EVERYTHING I COPIED

7    COPIED ACCURATELY.

8           ONE THING MR. GIBSON DID NOT ADDRESS THAT HIS EXPERT,

9    MR. FITZGERALD, HAS TOLD US AND I THINK SHOULD COME IN THE

10   FORM OF TESTIMONY OR AT LEAST A DECLARATION TO THE COURT IS

11   THAT, WHEN HE LOOKED AT THE APPLEYARD HARD DRIVE, THERE WAS AT

12   LEAST ONE (PAUSE) -- I'M MISSING THE WORD -- BUT LIKE DATA

13   CATCH.  THERE WERE BASICALLY THREE SEPARATE SOURCES OF DATA IN

14   THE APPLEYARD HARD DRIVE.  HE SAID ONE OF THEM WOULD NOT

15   MOUNT, AND TO HIM, IN HIS EXPERIENCE AS A FORENSIC EXAMINER,

16   THAT MEANS THAT THAT PART OF THE COPY WAS CORRUPTED, WHICH

17   POTENTIALLY MEANS THAT THERE ARE INACCURACIES IN THE WAY THAT

18   APPLEYARD'S DATA WAS COPIED.

19          NOW, WHAT YOU WOULD EXPECT THE GOVERNMENT TO DO WHEN

20   THEY GET SOMETHING FROM A COOPERATING WITNESS LIKE APPLEYARD,

21   WHO WAS GIVEN IMMUNITY, IS, THEY WOULD TAKE SOMETHING FROM HIM

22   AND DO A FORENSIC REPORT THEMSELVES TO SEE IF THIS THING

23   WORKS.  WELL, WE'VE GOT THE EXPERT HERE TODAY TO SAY THAT, IN

24   HIS OPINION, THERE IS SOME EVIDENCE OF INACCURACY IN THE

25   APPLEYARD HARD DRIVE.

1      SO I DON'T THINK THAT WE CAN JUST SAY THIS IS AN

2  ORIGINAL.  THROW OUT THE BEST-EVIDENCE RULE.  WE DON'T HAVE TO

3  WORRY ABOUT IT.  I THINK WE HAVE CONCRETE EXAMPLES OF

4  INACCURACY.

5      IN OUR PAPERS BEFORE, OR -- SORRY -- MR. GIBSON'S

6  PAPERS BEFORE, YOU KNOW, DISCUSSING THIS WITH MR. FITZGERALD,

7  IT WAS POINTED OUT THAT THERE ARE OTHER INACCURACIES IN THE

8  PRICER/APPLEYARD DATA THAT SHOULD GIVE THIS COURT SERIOUS

9  QUALMS BEFORE JUST SAYING, DON'T WORRY ABOUT THE BEST-EVIDENCE

10 RULE, THIS CAN BE CONSIDERED AN ORIGINAL, AND THAT WAS THE

11 TIME-STAMPING FUNCTION.  I THINK THERE'S AN EXHIBIT IN MR.

12 GIBSON'S PAPERS THAT SHOWS THAT AN ORDER WAS PLACED A MINUTE

13 AFTER IT WAS SET UP.  WE KNOW THAT CAN'T BE.  THE GOVERNMENT

14 KNOWS THAT CAN'T BE.  THEY SAY, WELL, IT JUST HAS SOMETHING TO

15 DO WITH THE SERVER CODE.  WE DON'T KNOW WHAT IT HAS TO DO

16 WITH.  WE KNOW IT'S INACCURATE, AND WE KNOW NOW THAT THERE IS

17 USABLE DATA IN THE ORIGINAL SERVERS THAT COULD SHOW THAT THAT

18 IS INACCURATE BECAUSE OF THE WAY THAT IT WAS COPIED.  WE DON'T

19 HAVE ORIGINALS.

20     SO THERE ARE TWO OTHER, I GUESS, EXCEPTIONS TO THE

21 ORIGINAL RULE THAT THE GOVERNMENT ARGUES SHOULD APPLY.  ONE IS

22 THAT THESE ARE DUPLICATES, AND I THINK FOR SIMILAR REASONS

23 THAT THE DUPLICATE RULE -- I THINK THAT'S RULE 1003 -- WOULD

24 NOT APPLY IN THIS CASE, BECAUSE ONE IS IF THERE'S AN ISSUE

25 ABOUT THE AUTHENTICITY OF THE ORIGINAL.  TO DATE, TODAY, WE

1    HAVE NO REASON TO TELL YOU THAT WHAT CAME FROM CYPRUS IS NOT

2    THE ORIGINAL.

3         BUT THE SECOND REASON THAT THE COURT WOULD NOT ACCEPT

4    IT IS IF THERE IS SOME OTHER REASON FOR FAIRNESS THAT THE

5    DUPLICATE SHOULD NOT BE ADMITTED.  WELL, OUR ARGUMENT IS TWO.

6    FIRST, THIS ISN'T A DUPLICATE.  A DUPLICATE IS DEFINED AS

7    HAVING TO BE OTHER, SOMETHING EQUIVALENT WHICH ACCURATELY

8    REPRODUCES THE ORIGINAL.  SO, FOR THE SAME REASON THAT IT'S

9    NOT AN ORIGINAL UNDER 1001, SUBSECTION (3), IT'S NOT A

10   DUPLICATE UNDER SUBSECTION (4).  WE HAVE, I THINK, EVIDENCE

11   THAT THAT'S THE CASE.

12        WE ALSO KNOW IT'S INCOMPLETE.  YOU KNOW, THE

13   GOVERNMENT SAYS, LOOK, IT'S 99-PERCENT, YOU KNOW, ACCURATE.

14   WE CAN EXPLAIN AWAY THE DIFFERENCE IN ORDERS BETWEEN WHAT

15   BELLIS SAW WHEN HE LOOKED AT THE ACTUAL SERVER UP AND RUNNING

16   AND WHAT WE HAVE ON THE PRICER/APPLEYARD DATA.  FOR PURPOSES

17   OF THE ORDERS, THERE'S AT LEAST SEVERAL HUNDRED ORDERS THAT

18   DON'T MATCH UP THERE.  BUT, MORE IMPORTANTLY, WE KNOW THAT

19   THERE MAY BE OTHER DATA THAT IS MISSING, PARTICULARLY THESE

20   INCOMPLETE ORDERS THAT MISS KENNEDY WAS ARGUING, THAT WOULD

21   CERTAINLY HAVE HELPED OUR ARGUMENTS ABOUT, YOU KNOW, WHAT THE

22   AFFILIATES KNEW OR SHOULD HAVE KNOWN BASED ON ORDERS COMPLETED

23   VS. INCOMPLETE ORDERS.  SO I THINK THAT WE DO HAVE A PROBLEM

24   THERE, AND THEN AGAIN THE INACCURACY.  SO IT CAN'T BE A

25   DUPLICATE.

1          THE ONLY POSSIBLE EXCEPTION THE GOVERNMENT COULD RELY

2     ON IS THE FINAL ONE, WHICH IS OTHER EVIDENCE WHEN THE ORIGINAL

3     HAS BEEN LOST OR DESTROYED, AND I THINK THAT'S RULE 1004.  THE

4     NINTH CIRCUIT HAS HELD THAT THE GOVERNMENT HAS THE BURDEN OF

5     PROVING THAT THE ORIGINAL HAS BEEN LOST OR DESTROYED, AND THEY

6     HAVEN'T DONE THAT IN THIS CASE.  THEY'VE TRIED TO, AND THIS IS

7     WHY I THINK THAT MR. WEISS'S REPRESENTATIONS TO THIS COURT

8     WERE SO FLAGRANTLY BAD.

9          HE SAID, LOOK, IT'S WIPED CLEAN.  THERE'S NOTHING

10    THERE.  THERE'S NOTHING USABLE.  WE KNOW NOW THAT WE HAVE A

11    FORENSIC REPORT, AND NOW THAT WE'VE HAD ACCESS TO THE DATA

12    THROUGH MR. GIBSON'S EXPERT, THAT IT IS USABLE DATA, THAT THE

13    GOVERNMENT BASICALLY TRIED TO CONVINCE THIS COURT YOU DIDN'T

14    HAVE TO DO THIS GATEKEEPING FUNCTION TO DECIDE WHETHER IT HAD

15    BEEN LOST OR DESTROYED, BECAUSE YOU ACCEPTED MR. WEISS'S

16    REPRESENTATION, WHICH WAS CLEARLY CONTRADICTED BY HIS OWN

17    FORENSIC REPORT, AS MISS KENNEDY SAID.

18         SO WHAT HAPPENED IS, THROUGH THAT MISREPRESENTATION,

19    THE COURT ACCEPTED THE PRICER/APPLEYARD DATA, THE TESTIMONY

20    BASED ON THAT DATA, THE EXHIBITS GENERATED FROM THAT DATA,

21    WHICH WAS AN EXTRAORDINARY AMOUNT OF THE EVIDENCE IN THIS

22    CASE, AND IT DID SO BASED ON MR. WEISS'S MISREPRESENTATIONS.

23         SO TO THE DEGREE THAT, UNDER YOUR SUPERVISORY POWERS,

24    YOU HAVE TO FIRST FIND A FLAGRANT MISREPRESENTATION AND THEN

25    SUBSTANTIAL PREJUDICE, YOU HAVE A MISREPRESENTATION BY MR.

1    WEISS THAT PRECLUDES YOU, UNDER THE BEST-EVIDENCE RULES

2    (PAUSE) -- IF YOU'LL JUST RECALL, HE SAID -- FORTUNATELY, MR.

3    HALPERN DOESN'T TRY TO REVIVE THIS ARGUMENT.  HE SAID, BEST

4    EVIDENCE DOESN'T APPLY TO COMPUTERS.  IT'S JUST WRITINGS,

5    BOOKS, OR WHATEVER.  WE KNOW THAT'S NOT TRUE.  IT APPLIES

6    SPECIFICALLY TO THIS EVIDENCE.  MR. WEISS MISREPRESENTED THE

7    STATE OF THE ORIGINAL EVIDENCE.  THEY HAVEN'T MET THEIR

8    BURDEN.  SO, AT THE END OF THE DAY, IF THE COURT DOESN'T

9    DISMISS THIS BECAUSE OF THE PREJUDICE FROM THE FIRST TRIAL,

10   IT'S NOT SIMPLY ENOUGH TO SAY, HOW MUCH TIME DO YOU, THE

11   DEFENSE, WANT TO --

12        THE COURT:  THAT'S WHAT I WAS GOING TO ASK YOU.  YOU

13   KNOW, ALL THE CASES THAT TALK ABOUT THIS, WE'RE IN A UNIQUE

14   SITUATION.  THE TRIAL HAS COME AND GONE.  WE'RE ABOUT TO BEGIN

15   A NEW TRIAL.  DOES THAT MAKE A DIFFERENCE?  AND, YOU KNOW,

16   I'VE READ THE CHAPMAN CASE.  THAT WAS RIGHT IN THE MIDDLE OF

17   THE TRIAL, AND I DON'T THINK YOU'RE GOING TO FIND ANOTHER CASE

18   THAT HAS THESE PARTICULAR FACTS.

19        AND SO, SUPPOSEDLY, YOU'RE GOING TO HAVE EVERYTHING,

20   AND ISN'T THAT SUFFICIENT TO BE ABLE, AND YOU HAVE AN

21   OPPORTUNITY TO PIECE TOGETHER THE FRAGMENTS, OR, AND IF YOU

22   HAVE THIS REPORT BY SEVEL, AND THERE'S SOME MORE INQUIRY ABOUT

23   THE ORIGINAL, ABOUT THE ORIGINAL EVIDENCE, THE HARD DRIVES, I

24   MEAN, NOT BY MARCH 2ND, THEN, IS THERE STILL PREJUDICE AND

25   HARM?  I KNOW THAT THESE GENTLEMEN HAVE BEEN WAITING FOR THEIR

1    DAY IN COURT FOR YEARS.  THEY HAD IT.  UNFORTUNATELY, IT

2    DIDN'T RESOLVE, AND NOW THEY'RE BACK.  THEY'VE SPENT A LOT OF

3    MONEY.  ANYWAY.  SO, IS THAT THE HARM, THEN?

4              MR. JOHNSTON:  THE HARM -- YES, IN PART, THAT IS THE

5    HARM.  I MEAN, THE HARM IS THAT THERE WAS, YOU KNOW, THERE WAS

6    NEAR ACROSS-THE-BOARD CONVICTIONS IN THE FIRST TRIAL BASED ON

7    A PATTERN AND PRACTICE OF MISCONDUCT, EVEN IF YOU NARROW IT

8    DOWN TO JUST ONE FLAGRANT MISREPRESENTATION.

9              THE COURT:  BUT WE'RE STARTING NEW NOW.

10             MR. JOHNSTON:  WE'RE STARTING NEW, BUT AS EVERYBODY

11   HAS SAID BEFORE, AT SOME POINT THERE HAVE TO BE CONSEQUENCES

12   FOR THE GOVERNMENT'S CONDUCT, AND TO THE EXTENT THAT THERE IS

13   NO CASE, I WOULD SAY THE COURT DOES NEED TO LOOK AT THE

14   PREJUDICE FROM THE FIRST TRIAL, TO LOOK AT THE TIME AND ENERGY

15   AND RESOURCES, TO CONSIDER -- I MEAN, YOU KNOW, EVEN MR.

16   BRODEN'S SPEEDY-TRIAL, YOU KNOW, ISSUE HAS BECOME EVEN MORE

17   AND MORE ON THE FRONT BURNER IN MY MIND AS WE SEE WHAT'S

18   HAPPENED.  THERE IS PREJUDICE, AND THERE WOULD EVEN BE MORE

19   SIGNIFICANT PREJUDICE TO THE EXTENT THAT WE'RE GOING TO HAVE

20   TO SPEND MORE AND MORE TIME, YOU KNOW, INVESTIGATING THIS

21   EVIDENCE AND SPENDING OUR OWN TIME AND RESOURCES ON IT.

22             BUT THE, I MEAN, I GUESS ONE PROBLEM IS THIS, IS THAT

23   IF THE COURT WERE TO NOT DISMISS BASED ON THIS CONDUCT, THEN

24   WE WOULD ASK, WE WANT TO GO TO TRIAL ON MARCH 3RD, BUT IT

25   SHOULD BE WITH THIS ELECTRONIC EVIDENCE EXCLUDED.  WE

1   SHOULDN'T HAVE TO TAKE THE TIME TO SPEND, YOU KNOW, FOUR TO

2   SIX MONTHS, OR A YEAR, OR WHATEVER IT TAKES TO GET THIS CASE

3   BACK TO TRIAL.  IT WOULD HAVE TO BE WITH ALL THE

4   PRICER/APPLEYARD DATA EXCLUDED.  IF THE COURT WENT FORWARD

5   WITH THAT, I THINK THERE WOULD BE SERIOUS ISSUES ON APPEAL

6   ABOUT THE ADMISSIBILITY OF THAT EVIDENCE, BECAUSE I DON'T

7   THINK THE GOVERNMENT WILL HAVE MET THEIR BURDEN, YOU KNOW,

8   UNDER THE THOUSAND SERIES TO PROVE, YOU KNOW, THAT THIS IS

9   LOST OR DESTROYED.

10         YOU KNOW, AT SOME POINT, THE COURT DOES HAVE TO -- I

11   MEAN, THIS IS USING YOUR SUPERVISORY POWERS, AND, YOU KNOW,

12   PREJUDICE HASN'T BEEN DEFINED IN THESE CIRCUMSTANCES, BUT

13   THERE'S BEEN IMMENSE PREJUDICE ON EVERY SINGLE PARTY.  THE

14   CLIENTS HAVE, YOU KNOW, MR. KOCH HAS WAITED YEARS AND YEARS,

15   AND HE'S REALLY BEEN IN A LIMBO.

16         THE COURT:  I UNDERSTAND.

17         MR. JOHNSTON:  THERE IS PREJUDICE, AND WE CAN POINT

18   TO PREJUDICE IN THE FIRST TRIAL.  WE CAN POINT TO PREJUDICE

19   FOR THIS NEXT TRIAL.  THE PREJUDICE WOULD BE HAVING TO DELAY

20   IT AND THEN PRESUMABLY HAVING TO SPEND CONSIDERABLE TIME AND

21   RESOURCES ON SOMETHING THAT SHOULD HAVE BEEN DONE BY THE

22   GOVERNMENT YEARS AGO.

23         THE COURT:  THANK YOU.

24         MR. GIBSON.

25         MR. GIBSON:  JUDGE, IF I MAY GO BEFORE MR. HALPERN.

1          THE COURT:  YES.

2          MR. GIBSON:  I DO WANT TO ADD TO THE FRACAS.  YOU

3   ASKED THE APPROPRIATE QUESTION.

4          THE COURT:  YES, BECAUSE THIS IS A UNIQUE

5   SITUATION --

6          MR. GIBSON:  IT IS.

7          THE COURT:  -- AND WE HAVEN'T STARTED THE TRIAL YET.

8          MR. GIBSON:  AND AS SOME OF THE CASES I READ, AND I

9   DON'T WANT TO QUOTE.  I DON'T KNOW IF IT'S BENNETT, OR ONE OF

10  THE OTHER CASES, OR FITZGERALD, AFTER CHAPMAN, BUT HERE'S THE

11  OTHER HARM THAT REALLY GOES TO THE SUPERVISORY POWERS, AND

12  AGAIN NO REFLECTION ON MR. HALPERN AND THE TEAM THAT'S HERE

13  NOW.  THE GOVERNMENT, AS A RESULT OF THE MISTRIAL, AND NOW IF

14  THE COURT WERE TO ALLOW THIS EVIDENCE IN AND NOT GRANT A

15  DISMISSAL FOR THE FLAGRANT VIOLATION OR THE RECKLESS

16  VIOLATION, HAS A PREVIEW OF THE ENTIRE CASE, AND THEY NOW HAVE

17  THE OPPORTUNITY TO TAKE -- THEY KNOW THEIR GOOD, STRONG PARTS

18  AND THEIR BAD PARTS, WHICH WITNESSES WERE GOOD AND WHICH

19  WITNESSES WERE BAD, AND THEY CAN TAILOR THEIR TESTIMONY, THEY

20  CAN TAILOR THEIR EVIDENCE, THEY CAN TAILOR THEIR PRESENTATION

21  TO BE MORE EFFECTIVE FROM WHATEVER VIEW THEY TAKE WITH THE

22  NEXT JURY, AND THAT IS PROFITING FROM THEIR OWN CONDUCT AT THE

23  EXPENSE OF THE DEFENDANTS' DUE-PROCESS RIGHTS.

24          IT'S REALLY PARTICULAR TO MY CLIENT AND MISS

25  KENNEDY'S CLIENT, BECAUSE THEY ALSO HAVE OUR CLIENTS'

1    TESTIMONY AND THEY CAN LOOK THROUGH THAT, AND THEY CAN NOW

2    HAVE THE TIME TO STUDY AND APPROACH IT AS A RESULT OF THE

3    MISTRIAL, IF THE COURT ALLOWS THIS CASE TO GO ON, AND PREPARE

4    OR EITHER BRING WITNESSES THAT ARE THERE.  SO IT IS THE

5    BENEFIT TO THE GOVERNMENT FOR HAVING A TRIAL GO FORWARD AFTER

6    THEIR MISCONDUCT HAS PREJUDICED US AND CREATED THE PROBLEM.

7    IT WASN'T THEIR MISCONDUCT THAT DIRECTLY CAUSED THE MISTRIAL,

8    BUT IN THIS UNIQUE SET OF FACTS, THAT IS A FACTOR, I THINK,

9    UNDER YOUR SUPERVISORY POWERS THAT YOU NEED TO TAKE INTO

10   ACCOUNT.

11          AND I WOULD BE REMISS -- MR. BRODEN ASKED ME TO

12   MENTION THIS.  THIS ALSO COULD FALL IN THE CATEGORY BECAUSE

13   HE'S PUSHED THE SPEEDY-TRIAL ISSUE, AND SO THE BARKER VS.

14   WINGO PRETRIAL DELAY AND PREJUDICE ISSUE NEEDS TO BE

15   CONSIDERED BY THE COURT.  AND I'M NOT SAYING THEY DID IT

16   INTENTIONALLY, BUT THERE ARE CASES WHERE THE GOVERNMENT'S

17   ACTIONS IN CAUSING A MISTRIAL DURING TRIAL BY ITS OWN

18   VIOLATIONS, SOMEWHAT LIKE A DOUBLE JEOPARDY, PRECLUDE THEM

19   FROM GETTING ANOTHER SHOT AT THE APPLE, BUT THERE IS SPECIFIC,

20   ARTICULABLE HARM IF WE GO FORWARD WITH THE TRIAL THAT BENEFITS

21   THE GOVERNMENT AND IS A DETRIMENT, A SIGNIFICANT DETRIMENT TO

22   THE DEFENDANTS THAT SHOULD PRECLUDE THE COURT FROM ALLOWING

23   THAT TO HAPPEN.

24          THANK YOU, YOUR HONOR.

25          MR. BRODEN:  YOUR HONOR, MAY I JUST ADD TO THAT?

1          THE COURT IS RIGHT.  THERE ARE NOT ANY CASES

2    PARTICULARLY ON POINT, BUT IT IS SIMILAR TO THE CASES WHERE

3    THE GOVERNMENT CAUSES A MISTRIAL DURING TRIAL.  THEY DON'T GET

4    TO BENEFIT FROM THAT MISBEHAVIOR.  YOU JUST HEARD ABOUT DOUBLE

5    JEOPARDY.  IN A SENSE, THAT'S WHAT THEY'VE DONE IN THIS CASE.

6    THEIR MISBEHAVIOR PREVENTED THE FIRST CASE FROM BEING

7    RESOLVED.  THEY SHOULDN'T, AND I DON'T WANT TO REPEAT WHAT MR.

8    GIBSON SAID, THEY SHOULDN'T GET THE BENEFIT OF ALL THAT, AND

9    SO THERE ARE SIMILAR CASES THAT THE COURT CAN DRAW AN ANALOGY

10   TO.

11          THE COURT:  OKAY.

12          MR. HALPERN, LET'S TALK ABOUT THAT LAST ISSUE.

13          MR. HALPERN:  PREJUDICE, YOUR HONOR?

14          THE COURT:  YES.

15          MR. HALPERN:  WELL, I THINK, NUMBER ONE, I AGREE WITH

16   THE DEFENSE IN THE SENSE THAT THE MATTER WOULD BE *SUI GENERIS*.

17   WE LOOKED FOR A CASE WHERE SOMETHING WAS DISMISSED UNDER THESE

18   CIRCUMSTANCES.  WE DIDN'T FIND ONE.  SO THE COURT WOULD BE

19   ALONE IN REACHING THAT FINDING.  I DO THINK THE CLOSEST

20   ANALOGY WOULD BE CHAPMAN, BUT CLEARLY I THINK THIS IS

21   DISTINGUISHABLE FROM CHAPMAN, AND I DO --

22          THE COURT:  BUT WASN'T THERE HARM IN THIS CASE?

23          MR. HALPERN:  YOUR HONOR, IF THERE WAS HARM THAT WAS

24   DELIBERATELY ATTRIBUTABLE TO GOVERNMENT MISCONDUCT, WHICH I

25   DON'T SEE YET, THAT'S ONE OF THE REASONS WE'RE HERE.  I KNOW

1    THE COURT HAD SOME PROBLEMS WITH DISCOVERY VIOLATIONS.  YOU'VE

2    MADE THAT CLEAR.  BUT IN TERMS OF WHAT THE HEARING IS ABOUT,

3    THAT'S STILL, IN MY MIND, NOT ESTABLISHED, BECAUSE I'M STILL

4    OF THE OPINION THAT THE SERVER, NO MATTER WHAT COUNSEL SAYS,

5    IS A BACKUP SERVER.  WITH DUE RESPECT TO MR. JOHNSTON, I DO

6    THINK WE HAVE MADE IT CLEAR THAT THESE AREN'T THE SERVERS THAT

7    WERE THERE.  THE COMPANY, AND FROM WHAT I KNOW OF THE

8    WITNESSES, WHETHER THEY ALL SAID IT IN TRIAL OR NOT, THEY HAD

9    MANY SERVERS OPERATING.  WHAT WE GOT WAS THE BACKUP SERVER.

10   IT WASN'T AN ORIGINAL.  IT'S NEVER BEEN PURPORTED TO BE THE

11   ORIGINAL, AND THAT'S MY UNDERSTANDING.

12            THE COURT:  YES.

13            MR. GIBSON, DO YOU WANT TO CLARIFY THAT?

14            MR. GIBSON:  YES, MA'AM.

15            THIS IS THE FIRST TIME WE'VE EVER HEARD THE IDEA THAT

16   THOSE BACKUP SERVERS WEREN'T THERE.

17            MR. HALPERN:  OH, NO.

18            MR. GIBSON:  THEY ARE A PART OF THE ENTIRE ARRAY OF

19   ABOUT 30 SERVERS.

20            THE COURT:  THAT'S RIGHT.  THEY WERE THERE IN CYPRUS.

21            MR. HALPERN:  YES, BUT THEY WEREN'T THE ORIGINALS.

22   THESE WERE BACKUPS.

23            MR. GIBSON:  WELL, THIS IS THE FIRST TIME THEY'VE

24   SAID THAT.  IT'S AN ARRAY OF 30 SERVERS THAT HAVE DIFFERENT

25   FUNCTIONS, AND A SET OF THE ORIGINAL SERVERS' FUNCTION IS TO

1    BE A BACKUP SYSTEM.  THAT'S WHAT I UNDERSTAND WE GOT.  UNLESS

2    I'M WRONG, THEN THAT'S HOW IT'S BEEN PRESENTED TO US.

3          MR. HALPERN:  FROM WHAT I UNDERSTAND, AND THIS IS

4    WHAT I'VE WRITTEN IN THE BRIEFS AND WHAT I'VE HEARD, THERE

5    WERE, I BELIEVE, SIX HARD DRIVES THAT WERE PART OF A SERVER.

6    THAT WAS A BACKUP SERVER, WITH A RAID ARRAY OF 14 HARD DRIVES

7    TIED TOGETHER, WHICH BACKED UP THE DATA, THE ORIGINAL DATA ON

8    THE SERVERS.  IT WASN'T INSTALLED AT THE SAME TIME.  THE

9    SERVERS GREW OVER TIME, AND THEY PUT IN A BACKUP SYSTEM WHICH

10   BACKED IT UP.  THAT'S MY UNDERSTANDING OF HOW THINGS WERE SET

11   UP.

12         THE COURT:  YES.  I THINK YOU'RE TALKING ABOUT THE

13   SAME THING.

14         MR. GIBSON:  I AGREE WITH THAT, EXCEPT MR.

15   APPLEYARD'S OWN TESTIMONY AT TRIAL WAS, HE DESCRIBED A

16   30-SERVER SYSTEM THAT HE MANAGED AND OVERLOOKED, WHICH THIS IS

17   A PART OF, AND SO I DON'T WANT TO -- I MEAN, THIS IS THE FIRST

18   TIME WE'VE HEARD IT.  IT'S REFLECTING PART OF A 30-SERVER SET,

19   WHICH WAS THE FUNCTIONING BACK-UP PORTION, IS WHAT I

20   UNDERSTAND WE HAVE.

21         THE COURT:  AND THERE'S NO DISPUTE ABOUT THAT.

22         MR. HALPERN:  WELL, NO DISPUTE WHATSOEVER ABOUT IT,

23   YOUR HONOR, AND THE ONLY DISPUTE WOULD BE AS TO WHAT IS AN

24   ORIGINAL.  BUT WITHOUT GETTING INTO THE BEST-EVIDENCE

25   ARGUMENTS HERE --

1          THE COURT:  RIGHT.

2          MR. HALPERN:  -- UNLESS THE COURT WANTS, THE QUESTION

3   WAS ONE OF PREJUDICE.  THERE'S ALWAYS PREJUDICE TO BOTH SIDES

4   WHEN THERE'S A RETRIAL.  THE FACT OF THE MATTER IS, I

5   RECOGNIZE WHAT -- I BELIEVE IT WAS MR. BRODEN WHO WAS TALKING

6   ABOUT PREJUDICE BECAUSE WE'VE SEEN PEOPLE TESTIFY BEFORE.

7   WELL, THEY'VE SEEN 30-SOME-ODD GOVERNMENT WITNESSES TESTIFY

8   BEFORE.  THEY'VE ALL HAD A LENGTHY CRACK AT IT.  IF WE'RE

9   LOOKING AT PREJUDICE, AND I KNOW THE COURT DOESN'T WEIGH IT,

10  BUT IT WOULD BE CLEARLY, YOU KNOW, THERE'S MORE PREJUDICE TO

11  THE GOVERNMENT, AND THIS IS THE TYPE OF PREJUDICE THAT HAPPENS

12  EVERY TIME THERE IS A MISTRIAL, A HUNG JURY, WHEN THERE'S A

13  RETRIAL.  IT'S REGRETTABLE, AND IT ONLY BECOMES PERTINENT IF

14  THE PREJUDICE IS DUE TO GOVERNMENT MISCONDUCT.  THEN THE

15  COURT, I THINK, CAN CONSIDER IT, BUT THE PREJUDICE WE'VE

16  TALKED ABOUT HERE TODAY IS STILL SPECULATION.  THE COURT --

17          THE COURT:  YOU MEAN AS FAR AS THE DATA.

18          MR. HALPERN:  YES, THE EFFECT OF THE DATA.  THERE'S A

19  CLEAR DISPUTE AND --

20          THE COURT:  SHOULD WE HAVE A FURTHER HEARING ON THAT?

21          MR. HALPERN:  WELL, IT'S UP TO THE COURT IF YOU --

22          THE COURT:  BUT I'M NOT SURE.  THAT'S NOT THE ONLY

23  THING THEY'RE HANGING THEIR HATS ON, EITHER.  IT'S THE PATTERN

24  MORE THAN ANYTHING.

25          MR. HALPERN:  WELL, THE PATTERN I SEE --

1          THE COURT:  THE PATTERN.

2          MR. HALPERN:  I WASN'T HERE BEFORE.

3          THE COURT:  BUT EVEN ASSUMING IT CAN'T BE PIECED

4     TOGETHER, THE REPORT, IF THEY'D HAD THE REPORT, THEY COULD

5     HAVE MADE THE DECISION WHETHER TO, IN FACT, TRY TO PIECE

6     TOGETHER THE FRAGMENTS --

7          MR. HALPERN:  AGREED, BUT --

8          THE COURT:  -- AND USE THEM.

9          MR. HALPERN:  THERE'S NO QUESTION.  THAT'S RIGHT.  I

10    DON'T DENY IT.  BUT WHEN WE'RE TALKING ABOUT A DISCOVERY

11    VIOLATION TO TRIGGER DISMISSAL OF A TRIAL, THIS IS A DRASTIC

12    REMEDY.  WE SHOULD AT LEAST KNOW THAT IT'S MATERIAL.  IF IN

13    FACT THE GOVERNMENT'S EXPERT IS CORRECT -- I WON'T EVEN SAY

14    THE GOVERNMENT.  THE GOVERNMENT'S EXPERT WHOSE JOB WAS TO TRY

15    TO PUT IT TOGETHER -- IT WASN'T THAT HE WAS TRYING NOT TO.  IF

16    HE'S CORRECT, THIS ISN'T A VIOLATION THAT WOULD WARRANT --

17    THERE'S NO VIOLATION, PERIOD.  ONCE YOU DON'T HAVE A

18    VIOLATION, THEN THERE'S NOTHING TO HANG YOUR HAT ON.

19          NOW, THE COURT SHOULD BE CONCERNED.  I DO THINK IF

20    THE REPORT WAS GIVEN OVER, YOU KNOW, WE'RE NOT HERE.  THIS

21    ISSUE DOESN'T COME UP.  BUT THERE'S CERTAINLY -- THAT'S A FAR

22    CRY FROM A DISCOVERY VIOLATION, AND THAT'S WHY THESE POINTS

23    ARE IMPORTANT.

24          I COME BACK.  I READ THE RECORD, YOUR HONOR.  THE

25    COURT HAS READ IT.  MR. WEISS SAID WIPED ONCE, BUT RIGHT AFTER

1    THAT HE SAID, OR LITTLE OR NO USEFUL DATA.  THE COURT

2    UNDERSTOOD THAT.  THE NEXT TIME HE CAME IN, HE SAID NO USEFUL

3    DATA.  I UNDERSTAND WHY THEY WANT TO PORTRAY THAT.  I THINK

4    THE RECORD IS CLEAR.  THERE WERE NO DELIBERATE MISSTATEMENTS

5    THERE.  THERE WERE NO DELIBERATE MISSTATEMENTS ABOUT MR.

6    FISHER.  AND WITHOUT THOSE, I THINK THE COURT WOULD REALLY BE

7    GOING TO NEW GROUND IN TAKING WHAT IS REALLY A DRASTIC REMEDY.

8    AND IT'S UNFORTUNATE THAT WE'RE HERE, BUT DOES THIS WARRANT,

9    ON WHAT IS SPECULATION, A REVERSAL?  I WOULD SAY NOT.

10            AND WHILE THIS MAY BE DISTURBING, YOU KNOW, THERE WAS

11   A NOTION THAT WE TOOK YOUR GATEKEEPING RESPONSIBILITIES AWAY.

12   YOUR HONOR, AS YOU KNOW, WE HAVE TO MAKE THESE DECISIONS ALL

13   THE TIME.  THE COURTS DON'T WANT US TO BRING THINGS BACK.  ON

14   THIS ONE, I WOULD HAVE TURNED IT OVER.  SO YOU WOULDN'T HAVE

15   HAD TO GATEKEEP IT FROM ME.  AT A MINIMUM, I WOULD HAVE LOVED

16   IT IF IT WAS GIVEN TO YOU.  BUT WE DO HAVE TO MAKE THESE

17   RESPONSES, WE DO HAVE TO MAKE THESE JUDGMENTS, AND A

18   PROSECUTOR LOOKING AT OUR EXPERT REPORT OR TALKING TO THE

19   EXPERT, AND YOU'VE SEEN HIS DECLARATION, WHEN HE SAYS HE

20   DOESN'T THINK IT CAN BE PIECED TOGETHER, HIS ACTION WAS

21   UNDERSTANDABLE, REASONABLE, NOT EVEN NEGLIGENT.

22            THE COURT:  BUT EVEN IN LIGHT OF MR. GIBSON'S REQUEST

23   THAT ALL REPORTS, EXPERT REPORTS AND ANY OTHER REPORTS BE

24   TURNED OVER AND THAT THERE IS A CONTINUING OBLIGATION?

25            MR. HALPERN:  YOUR HONOR, THERE'S NO QUESTION HE

1    SHOULD HAVE.  IN A PERFECT WORLD, I THINK HE WOULD HAVE TURNED

2    IT OVER.  IF YOU'RE ASKING ME, DOES HE HAVE TO UNDER THE LAW?

3    I MEAN, WE'RE LAWYERS.  I HAVE TO TELL YOU.  YOU'VE GOT TO

4    LOOK AT LEGAL VIOLATIONS THAT COULD TRIGGER SANCTIONS, AND THE

5    CASE LAW IS CLEAR.  UNLESS THERE IS SOMETHING ON THAT, HE

6    DOESN'T HAVE TO TURN IT OVER.

7         I MEAN, YOU'RE ASKING ME, MR. HALPERN, ISN'T IT

8    BETTER?  SHOULDN'T HE HAVE DONE IT?  I WOULD LIKE TO HAVE.  HE

9    HAD NO OBLIGATION, THOUGH, AND IF HE HAD NO OBLIGATION, IF

10   THERE'S NOTHING ON IT, AND THAT'S WHAT THE EXPERT SAYS, AND IF

11   RELYING ON A GOVERNMENT EXPERT IS ERROR, YOU KNOW, I WOULD SAY

12   IT'S A VERY SLIGHT ERROR, IF ANY.  I WOULD ARGUE IT ISN'T, BUT

13   IT'S CERTAINLY NOT RECKLESS.  IT'S, AT BEST, NEGLIGENT, AND

14   THAT'S WHAT THE STATE OF THE LAW IS, AND THAT'S CLEAR.

15        THE COURT:  ANYTHING ELSE?

16        MR. HALL:  YOUR HONOR, I'D LIKE TO ADDRESS A COUPLE

17   POINTS ON THE PREJUDICE THAT I THINK ARE SOMEWHAT UNIQUE TO

18   THE PHARMACISTS AND THEIR SITUATION.

19        AS YOU MAY RECALL, WITH RESPECT TO COUNT 18 IN THE

20   INDICTMENT AND THE AIRPLANE-WING CHART, THERE WAS A

21   DISCREPANCY WHICH I ATTEMPTED TO ARGUE TO THE JURY, AND

22   PERHAPS NOT VERY EFFECTIVELY, ABOUT THE NAME, THE PERSON TO

23   WHOM THE MEDICATION WAS SENT AND THE NAME THAT THEY HAD ON THE

24   CHART, THE ROSA, WHAT I'LL CALL THE ROSA KRECKELBERG.  I

25   BELIEVE THAT AT THE TIME THAT I WAS MAKING THESE ARGUMENTS,

1    MR. WEISS WAS SITTING HERE, AWARE THAT THE HARD DRIVES WERE,

2    WERE, DID HAVE SOME INFORMATION ON THEM, THAT THEY WERE NOT

3    COMPLETELY WIPED CLEAN, AND HE REMAINED SILENT DURING THE

4    TRIAL AS I WAS ATTEMPTING TO ARTICULATE HOW THE JURY COULD NOT

5    CONVICT ON THIS BECAUSE THERE WAS ERROR HERE, AND THE ERROR IS

6    NOT JUST THEORETICAL, BUT IT'S THE LINK-UP OF THAT

7    INFORMATION.

8         AS YOU MAY RECALL, IT WAS A MELANIE GARCIA WITH THE

9    FEDERAL EXPRESS RECORD, BUT WE DON'T KNOW WHAT WAS MAILED TO

10   HER.  THERE WERE NO PRESCRIPTIONS ADMITTED AT THE TRIAL

11   REGARDING THAT, AND THE PERSON THAT HAD ORDERED THAT,

12   ACCORDING TO THE CHART, WAS ROSA KRECKELBERG, AND IT WAS A

13   CONTROLLED-SUBSTANCE COUNT, AND SO THERE WAS, THERE WAS AN

14   ISSUE ABOUT THE RELIABILITY OF THIS, WHICH WE ATTEMPTED TO

15   RAISE, BUT NOT PERHAPS VERY EFFECTIVELY.

16        AND SO TO THE EXTENT THAT WE WERE PRECLUDED BECAUSE

17   WE DIDN'T HAVE INFORMATION THAT THERE WAS, THAT THE HARD

18   DRIVES WERE THERE, AND I DON'T PURPORT TO USE THE CORRECT

19   TERMINOLOGY IN THIS, BUT I THINK, IN EFFECT, WHAT I'M

20   ARTICULATING TO THE COURT WAS, MR. WEISS SAT HERE SILENT,

21   KNOWING THAT THERE WOULD BE SOMETHING THAT I COULD HAVE

22   EFFECTIVELY USED TO CROSS-EXAMINE AND CHALLENGE THAT, AND HE

23   DID NOT PRESENT THAT OR ALERT THE COURT TO ITS EXISTENCE.

24        I ALSO WOULD POINT OUT TO THE COURT THAT THERE WAS

25   EXHIBIT 84, WHICH WAS, WE FILED AN *IN LIMINE* ON IN CONNECTION

1    WITH THE UPCOMING TRIAL, BUT IT RELATED TO THE ARCHIVE

2    DOCTORS, AND AGENT BRIDGERS' TESTIMONY WAS THAT HE ACCESSED

3    THE, I BELIEVE IT WAS THE APPLEYARD DATABASE, AND HE CAME UP

4    WITH ARCHIVE.  WHAT I'M LED TO BELIEVE FROM TALKING VERY

5    BRIEFLY WITH MR. GIBSON'S EXPERT IS THAT THEY HAVE AN ABILITY

6    THAT THEY CANNOT ONLY GO BACK AND LOOK AT THE FRAGMENTS, BUT

7    THEY CAN GO BACK AND PERHAPS RECONSTRUCT WHAT MAY HAVE BEEN ON

8    DIFFERENT DATES WITHIN THOSE HARD DRIVES.

9         AND SO, AS YOU MAY RECALL, MICHAEL PRICER TESTIFIED

10   THAT ON SOME DATE IN MARCH HE WENT BACK AND CHANGED THE CODE

11   IN THE COMPUTER SO THAT CERTAIN DOCTORS' NAMES CAME OUT AS

12   ARCHIVE, AND AS A RESULT THERE WAS A CHART THAT LISTED

13   HUNDREDS AND HUNDREDS OF EXAMPLES OF ARCHIVE PRESCRIPTIONS

14   PURPORTEDLY FILLED BY ST. VRAIN.  WE WERE PREJUDICED IN THAT

15   WE COULD NOT CROSS-EXAMINE AGENT BRIDGERS EFFECTIVELY

16   REGARDING OTHER ALTERNATIVE MEANS HE COULD HAVE RECONSTRUCTED

17   THAT CHART TO EFFECTIVELY PRESENT TO THE JURY THAT THESE DID

18   NOT GO OUT AS ARCHIVE, THAT THESE WENT OUT AS REAL DOCTORS'

19   NAMES, AND I THINK THAT THAT POINT WAS TOTALLY LOST ON THE

20   JURY, AND WE WERE PREJUDICED IN THAT REGARD, BUT I BELIEVE

21   THAT WE WERE PREJUDICED IN THE TRIAL BY KEEPING THAT

22   INFORMATION FROM US, AND I'M NOT CERTAIN TODAY WHETHER ON

23   THOSE HARD DRIVES WE CAN GO BACK AND RECONSTRUCT WHO THE REAL

24   DOCTORS WERE THAT ISSUED THOSE OR THAT THE NAMES OF THE

25   PRESCRIPTIONS WERE ISSUED UNDER AS OPPOSED TO ARCHIVE, BUT I'M

1    LED TO BELIEVE THAT THAT IS SOMETHING THAT MAY BE POSSIBLE BY

2    ACCESS TO THE HARD DRIVES.

3         I WOULD SUBMIT TO THE COURT THAT THERE IS A PATTERN,

4    AND I WOULD ADD A FEW THINGS TO THE PATTERN OF MISCONDUCT BY

5    MR. WEISS.  YOUR HONOR MAY RECALL THAT, WHEN I WAS

6    CROSS-EXAMINING AGENT GASSEN, MR. WEISS HAD MET WITH HIM THE

7    NIGHT BEFORE AND LEARNED THAT HE HAD NOTES OF THE CONVERSATION

8    WITH MS. LOVIN DURING HIS INSPECTION, AND WE HAD TO RECESS THE

9    TRIAL AND WAIT FOR 15 MINUTES FOR AGENT GASSEN TO GO BACK TO

10   THE HOTEL TO RETRIEVE THESE NOTES.  THAT'S NOT SOMETHING,

11   THAT'S NOT THE MISTAKE OF A NOVICE PROSECUTOR.  THAT'S

12   SOMETHING THAT I BELIEVE HE INTENTIONALLY DISREGARDED AND DID

13   NOT PRODUCE.

14        ULTIMATELY, YOU PRODUCED THEM, AND SO WE WEREN'T

15   PREJUDICED IN THAT RESPECT, BUT I THINK IT LEADS TO THE

16   CONCLUSION THAT THERE WAS A SERIES OF JUDGMENT CALLS BY MR.

17   WEISS.  ONE OF THOSE INVOLVED DR. NORRELL.  AS YOUR HONOR MAY

18   RECALL, WE HAD *IN LIMINE* MOTIONS ABOUT DR. NORRELL, BUT IT

19   WASN'T UNTIL RIGHT BEFORE SHE TESTIFIED THAT WE WERE GIVEN A

20   COPY OF AGENT BRIDGERS'S INTERVIEW REPORT OF DR. NORRELL.  AND

21   AGAIN, WE WERE NOT PREJUDICED TO THE EXTENT THAT WE HAD IT AT

22   THE TIME WE ACTUALLY CROSS-EXAMINED HER, BUT IT WAS WITHHELD

23   FROM US EVEN DURING THE TIME WHEN WE WERE ARGUING WHAT HER

24   POTENTIAL TESTIMONY WAS, AND HE KNEW THAT SHE WOULD BE

25   TESTIFYING.

1           I WOULD ALSO REMIND THE COURT THAT THERE WERE A

2     NUMBER OF OCCASIONS WHERE, AT THE CONCLUSION OF THE DAY DURING

3     THE TRIAL, WE WOULD STAND UP AND ASK, WHO ARE THE WITNESSES

4     THE NEXT DAY?  AND THEN WE WOULD GET A LIST OF PATIENTS.  AND

5     THEN WE WOULD SAY, WE DON'T HAVE REPORTS FOR THESE PEOPLE.

6     AND MR. WEISS WOULD CONTRADICT US AND SAY, YES, YOU DO.  YES,

7     YOU DO.  AND THEN I BELIEVE THERE WERE AT LEAST TWO OCCASIONS

8     DURING THAT TRIAL WHERE, THE NEXT MORNING, HE WOULD COME IN

9     AND HAND US REPORTS AUTHORED BY THE AGENTS, WHICH WERE

10    SUMMARIES OF INTERVIEWS BY THESE WITNESSES.

11          AGAIN, WE HAD THEM AT THE TIME WE ULTIMATELY

12    CROSS-EXAMINED THEM, BUT I BELIEVE IT WAS RECKLESS CONDUCT,

13    AND YOUR HONOR WAS SO PERTURBED AT ONE POINT -- I BELIEVE YOUR

14    HONOR MAY RECALL THIS -- YOU ORDERED MR. WEISS TO TALK TO ALL

15    OF THE AGENTS AGAIN ABOUT WHAT REPORTS THEY HAD PREPARED, AND

16    I WOULD SUBMIT THAT ALL OF THESE FLAVOR THE CONTEXT WITH WHICH

17    THE HARD DRIVES WERE NOT ADEQUATELY DISCLOSED TO US OR

18    PRODUCED TO US.

19          FINALLY, I WOULD JUST MAKE THIS COMMENT:  THAT, TO

20    PUT INTO CONTEXT WHAT MR. WEISS DID WAS, WAS, AND EVEN I THINK

21    MR. HALPERN ALLUDED TO IT TODAY, YOUR HONOR WILL RECALL THAT

22    IN ABOUT MID-JANUARY OF LAST YEAR I FILED A MOTION TO

23    CONTINUE, AND ON THE 30TH I WAS UP HERE ARGUING TO YOUR HONOR

24    THE REASON WHY WE NEEDED TO CONTINUE THE TRIAL, AND IF I MAY

25    BE SO BOLD, I THINK YOUR HONOR WAS SLIGHTLY PERTURBED WITH MY

1    REQUEST, AND TO PARAPHRASE MR. GIBSON, I THINK I WAS THE

2    DESIGNATED SPEAR-CATCHER THAT DAY.  BUT AT THE TIME THAT WE

3    WERE ARGUING THAT, MR. WEISS HAD ALREADY RECEIVED THAT JANUARY

4    22ND BRIDGERS E-MAIL, AND I WOULD SUBMIT TO YOUR HONOR THAT AT

5    THE TIME HE WAS ADAMANTLY OPPOSED TO US CONTINUING THAT TRIAL.

6    HE FOUGHT US ON THAT VERY STRENUOUSLY, AND I WOULD SUBMIT THAT

7    THAT FLAVORS THE ADVOCACY AND PUTS IN CONTEXT, PERHAPS, THE

8    REASONS WHY HE DIDN'T DISCLOSE THIS, WHICH WAS WHY HE DIDN'T

9    GIVE IT TO US AT THE TIME.  HE DIDN'T WANT US TO GET THAT

10   TRIAL CONTINUED.  HE WANTED US TO PROCEED.

11           AND SO I WOULD AGREE WITH THE COMMENTS OF OTHER

12   COUNSEL THAT WE HAVE BEEN PREJUDICED BY THIS.  MS. LOVIN HAS

13   GONE THROUGH SIGNIFICANT EXPENSE DURING THE FIRST TRIAL, WHICH

14   WE BELIEVE WAS MUCH LONGER THAN IT SHOULD HAVE BEEN, AND I

15   WOULD SUBMIT THAT THE APPROPRIATE SANCTION IS DISMISSAL, YOUR

16   HONOR.

17           MR. LEMON:  (STANDING)

18           MR. BRODEN:  YOUR HONOR, MAY I FOLLOW UP ON ONE THING

19   THAT WAS BROUGHT TO THE COURT'S ATTENTION?

20           THE COURT:  YES.

21           WE'LL LET MR. LEMON GO FIRST.

22           MR. LEMON:  THANK YOU, YOUR HONOR.

23           YOUR HONOR, I HAVE VERY LITTLE TO ADD TO THIS

24   DISCUSSION, EXCEPT WITH RESPECT TO THE PATTERN AND PRACTICE

25   THAT YOUR HONOR MENTIONED EARLIER.  THERE'S ONE ADDITIONAL

1    THING THAT I WOULD JUST LIKE TO REMIND THE COURT, WHICH IS

2    THAT MR. HALL AND I HEARD FOR THE FIRST TIME IN THE

3    GOVERNMENT'S OPENING STATEMENT ABOUT SOMETHING THAT MS. LOVIN

4    ALLEGEDLY STATED TO INSPECTOR GASSEN, AND THE GOVERNMENT TOOK

5    A VERY AGGRESSIVE POSITION THAT HER STATEMENT WAS NOT

6    DISCOVERABLE UNDER RULE 16 BECAUSE INSPECTOR GASSEN WAS NOT

7    TECHNICALLY A GOVERNMENT AGENT.  MAYBE THEY'RE RIGHT ABOUT

8    THAT, BUT IT JUST SEEMED TO ME SOMETHING FUNDAMENTALLY WRONG

9    ABOUT HEARING ABOUT, BASICALLY, MY OWN CLIENT'S STATEMENT FOR

10   THE FIRST TIME IN OPENING STATEMENT, AND THEN IT TURNED OUT TO

11   BE THE SAME WITNESS WHO HE HAD NOT PRODUCED THE JENCKS

12   MATERIAL ON, AGAIN INSPECTOR GASSEN.  SO I JUST WANTED TO

13   REMIND THE COURT ABOUT THAT.

14            THE COURT:  MR. BRODEN.

15            MR. BRODEN:  YOUR HONOR, I HAVEN'T HAD A CHANCE TO

16   LOOK THROUGH IT IN DEPTH, BUT ON APRIL 30TH, STARTING AT

17   AROUND PAGE 82, MR. WEISS DIRECTS, OR MISS KANE DIRECTS AGENT

18   BRIDGERS REGARDING HIS ACCESS TO THE SERVERS.  IF YOU LOOK AT,

19   AND I HAD MENTIONED THIS BEFORE, BECAUSE I STILL THINK WE'RE

20   NOT GETTING ALL THE DISCOVERY EVEN AS WE SIT HERE NOW.  IF YOU

21   LOOK AT ATTACHMENT A TO WEISS'S EXHIBIT, IT'S E-MAIL FROM

22   BRIDGERS REGARDING ACCESS TO THE SERVERS THAT WERE ONLY TURNED

23   OVER IN RESPONSE TO A MOTION, THE COURT'S SHOW-CAUSE ORDER.  I

24   DON'T KNOW WHAT MR. HALPERN'S EXPLANATION IS AS TO WHY THIS

25   WOULDN'T BE JENCKS MATERIAL, BUT IT'S CLEARLY E-MAILS,

1    STATEMENTS BY BRANDON BRIDGERS REGARDING ACCESS TO THE

2    APPLEYARD HARD DRIVE, WHICH IS WHAT HE TESTIFIED TO ON APRIL

3    30TH, YOU KNOW, AGAIN STARTING AT PAGE 82.

4           AND I HAVEN'T GONE THROUGH IT ALL, BUT THERE'S STILL

5    JENCKS MATERIAL, I BELIEVE, OUT THERE THAT, YOU KNOW, AGENT

6    DAMONE CLAIMS, OR I DIDN'T FULLY UNDERSTAND IT, BUT THAT HE

7    DOESN'T HAVE E-MAILS ANYMORE.  THERE ARE BRIDGERS' E-MAILS

8    THAT HAVEN'T BEEN TURNED OVER.  I REALLY THINK THERE'S STILL

9    DISCOVERY OUT THERE THAT WE'RE NOT GETTING.  BUT THE BOTTOM

10   LINE IS, HAD WE GOTTEN THIS BRIDGERS JENCKS MATERIAL PRIOR TO

11   TRIAL, AS THE COURT ORDERED, MR. GIBSON AND THE REST OF THE

12   DEFENSE COUNSEL WOULD HAVE THEN KNOWN ABOUT THIS ACCESS TO

13   THE A2.

14          THE COURT:  THANK YOU.

15          ANY LAST WORDS?

16          MR. HALPERN:  JUST ONE.

17          OBVIOUSLY, THAT E-MAIL WAS TURNED OVER, YOUR HONOR.

18          I THINK THE COURT IS RIGHTLY CONCERNED ABOUT

19   PREJUDICE.  SO THAT'S REALLY THE ONLY POINT THAT I WANT TO

20   ADDRESS, AND I THINK WHAT'S IMPORTANT TO STRESS IS THAT THE

21   PREJUDICE IN ORDER TO TAKE A DRASTIC STEP HERE HAS TO BE MORE

22   THAN SIMPLY THE PREJUDICE OF HAVING, YOU KNOW, TO GO THROUGH A

23   RETRIAL.  THERE'S NO SUPPORT FOR THAT.

24          SO YOU HAVE TO LOOK AND ASK ABOUT INDIVIDUALIZED

25   PREJUDICE.  MR. HALL GAVE YOU AN EXAMPLE OF WHAT I WOULD

1    CONSIDER WOULD BE INDIVIDUALIZED PREJUDICE THAT THE COURT

2    COULD HANG ITS HAT ON.  HOWEVER, THE FACT IS, I BELIEVE, AND I

3    SAY THIS WITH GREAT RESPECT FOR PAT, WHO'S A GOOD ATTORNEY,

4    HE'S WRONG ON THE FACTS IN THAT THE A2 DATA WHICH WAS RECENTLY

5    TURNED OVER DOESN'T HAVE THAT INFORMATION.  THE INFORMATION ON

6    THAT ORDER HAS ALL BEEN TURNED OVER ON THE ONE THAT HE, YOU

7    KNOW, ASSERTS WAS ROSA KRECKELBERG, AND I THINK ALSO THE

8    ARCHIVE SITUATION.  IT WAS IN THE EVIDENCE, WHETHER IT WAS

9    UNCOVERED OR NOT.

10          THERE WAS A QUESTION, I THINK, MISS KENNEDY MADE, YOU

11   KNOW, AS TO THE GOVERNMENT HAS MORE OF AN OBLIGATION THAN JUST

12   TURNING OVER THE EVIDENCE.  WELL, I DISAGREE, YOU KNOW, ON

13   THAT.  WE HAVE WHENEVER WE'RE ABLE TO POINT TO THINGS, AND

14   I'VE DONE THAT TO MR. BRODEN MANY TIMES.  BUT IN TERMS OF A

15   DISCOVERY VIOLATION TO WARRANT A DISMISSAL, YOU KNOW, WE

16   SIMPLY DON'T HAVE THAT TYPE OF PREJUDICE HERE.

17          MR. BRODEN:  YOUR HONOR, JUST LET ME ADD, THE COURT

18   REQUIRED MR. WEISS TO IDENTIFY SPECIFICALLY ALL THE BRADY

19   MATERIAL FOR DEFENSE COUNSEL AND TO UPDATE THAT BRADY

20   MATERIAL.  SO I THINK MISS KENNEDY, WHETHER MISS KENNEDY OR

21   MR. HALPERN IS RIGHT OR WRONG ON THE LAW IN GENERAL, IN THIS

22   SPECIFIC CASE THERE WAS AN ORDER FROM THE COURT THAT MR. WEISS

23   PREPARE A BRADY LETTER SPECIFICALLY IDENTIFYING BRADY MATERIAL

24   AND TO UPDATE THAT.

25          MR. HALPERN:  OKAY.  I DON'T QUARREL WITH THAT.  THE

1    GOVERNMENT'S POSITION HAS ALWAYS BEEN, AND IT IS IN WRITING,

2    THAT IT'S NOT EXCULPATORY.  IT'S THERE, AND THAT'S NOT GOING

3    TO CHANGE.

4              THE COURT:  YES, THE BRIDGERS E-MAIL.

5              MR. HALPERN:  WELL, THE JENCKS IS DIFFERENT.

6              THE COURT:  OKAY.

7              MR. HALPERN:  BUT I'M TALKING ABOUT THE DATA THAT MS.

8    KENNEDY WAS CONCERNED WITH, WE PUT IT IN WRITING.

9              AS TO BRIDGERS, I THINK I'VE DISCUSSED THAT.  IT IS A

10   VIOLATION, AND IT'S CERTAINLY NOTHING THAT I WOULD SUGGEST THE

11   COURT SHOULD HANG ITS HAT ON IN TERMS OF A DRASTIC REMEDY,

12   ESPECIALLY IN LIGHT OF THE FACT THAT WE'RE NOT EVEN SURE THAT

13   THEY HAVE EVERYTHING THAT THEY'RE REQUIRED TO IN TERMS OF

14   JENCKS, EVEN IF IT IS ONLY A COUPLE PIECES OF PAPER.

15             MS. KENNEDY:  YOUR HONOR, I WOULD JUST LIKE TO POINT

16   OUT THAT, YOU KNOW, GOVERNMENT COUNSEL BELIEVES IT'S A DRASTIC

17   REMEDY, BUT THESE ARE DRASTIC MISREPRESENTATIONS FROM THE

18   FIRST TRIAL.

19             THE COURT:  I UNDERSTAND.

20             MS. KENNEDY:  AND SO I MEAN, YOU KNOW, THEY ARE, LIKE

21   MR. GIBSON SAID, THEY ARE PROFITING FROM THEIR CONDUCT FROM

22   THAT FIRST TRIAL AND THEY GET ANOTHER SHOT, ANOTHER BITE AT

23   THE APPLE, AND THERE'S THE PREJUDICE.  ESPECIALLY, MR. TYLER

24   TESTIFIED.  MR. LIGHT TESTIFIED.  AS MR. GIBSON SAID, THEY ARE

25   IN A MUCH BETTER POSITION, AND THEIR ARGUMENT IS THAT WE'RE IN

1    A MUCH BETTER POSITION, BUT THEY'RE IN A MUCH BETTER POSITION

2    BECAUSE OF THEIR MISCONDUCT AND THEIR MISREPRESENTATIONS.

3            THE COURT:  THANK YOU.

4            THIS IS MY TIME LINE.  I'M GOING OUT OF TOWN IN ABOUT

5    AN HOUR.  I WILL BE GONE FRIDAY, BUT I WILL ISSUE AN ORDER AS

6    SOON AS I CAN NEXT WEEK.  I KNOW WE HAVE OTHER THINGS TO TAKE

7    CARE OF THAT ARE SCHEDULED AT THIS TIME FOR THE FOLLOWING, I

8    THINK IT'S THE FOLLOWING WEEK.  TWO WEEKS LATER.  BUT I DO

9    BELIEVE THAT I SHOULD DO A WRITTEN ORDER, OBVIOUSLY, AND SO I

10   WILL TRY TO GET THAT OUT BY TUESDAY OF NEXT WEEK.

11           MR. BRODEN:  I'M SORRY.  I DIDN'T HEAR THE LAST PART.

12           THE COURT:  BY TUESDAY.

13           MR. BRODEN:  NO.  SOMETHING ABOUT MOVING?

14           THE COURT:  NO.

15           MR. BRODEN:  OKAY.

16           THE COURT:  NO.  I'M SORRY.  NO.  I HAVE OTHER

17   MOTIONS THAT YOU HAVE ALL FILED THAT ARE SCHEDULED TO BE

18   HEARD, I THINK, ON THE 16TH.

19           MR. BRODEN:  CORRECT.

20           THE COURT:  SO I DO WANT TO GET TO THIS MATTER,

21   OBVIOUSLY, AS SOON AS I CAN, AND SO I'M HOPING THAT BY TUESDAY

22   I CAN DO IT, BY THIS COMING TUESDAY, WHICH WOULD BE THE 2ND OF

23   FEBRUARY.

24           OKAY, THANK YOU.

25           MR. BRODEN:  YOUR HONOR, I HAVE ONE MATTER JUST WITH

1    REGARD TO MR. BIDWELL AND THE PRETRIAL RELEASE.  APPARENTLY, I

2    GUESS AN ISSUE HAPPENED WITH MR. LIGHT REGARDING POSSESSION OF

3    FIREARMS WHILE PEOPLE ARE ON PRETRIAL RELEASE.  NOW, PRETRIAL

4    WANTS, MY UNDERSTANDING IS, MR. BIDWELL TO TURN THEM IN TO

5    SOME SORT OF DEPOSITORY AND PAY STORAGE FEES.  WOULD IT BE

6    PERMISSIBLE FOR HIM TO TURN HIS FIREARMS OVER TO HIS

7    BROTHER-IN-LAW?

8                THE COURT:  YES.

9                MR. BRODEN:  THANK YOU.

10               THE COURT:  I WILL ALLOW THAT AS LONG AS -- I DON'T

11   KNOW.  PRETRIAL ISN'T HERE, BUT --

12               MR. BIDWELL:  I'M HERE.

13               THE COURT:  NO, BUT PRETRIAL SERVICES ISN'T HERE.

14               BUT AS LONG AS YOU TELL THE PRETRIAL SERVICES OFFICER

15   THAT I HAVE ALLOWED THAT, AND WE'LL DO A MINUTE ORDER TO THAT

16   EFFECT, THAT HE CAN RELEASE HIS FIREARMS TO HIS

17   BROTHER-IN-LAW.  IS THAT IT?

18               MR. BRODEN:  YES.

19               THE COURT:  RATHER THAN TO PAY FOR STORAGE FEES.

20               MS. KENNEDY:  AND, YOUR HONOR, JUST SO THE COURT'

21   AWARE, MR. TYLER HAS NOT BEEN TOLD THAT BY HIS PRETRIAL

22   OFFICER, BUT IN CASE THAT THAT HAPPENS, AND I UNDERSTAND THE

23   COURT'S NEW RULE, IF IT'S OKAY IF HE TURNS HIS GUNS OVER TO

24   HIS FATHER.

25               THE COURT:  ANOTHER CUSTODIAN.  YES.

1          MS. KENNEDY:  THANK YOU.

2          THE COURT:  OKAY.

3          (PROCEEDINGS ADJOURNED AT 11:00 A.M.)

4   --------------------------------------------------------------

5                    (END OF TRANSCRIPT)

6

7          I, FRANK J. RANGUS, OFFICIAL COURT REPORTER, DO

8   HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

9   ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

10

11         S/FRANK J. RANGUS

12         FRANK J. RANGUS, OCR

13

14

15

16

17

18

19

20

21

22

23

24

25